UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>                                    Plaintiff,<br><br>v.<br><br>BRANDON KEMMERER,<br><br>                                    Defendant. | Case No.: 3:19-CR-02513-GPC<br><br>**ORDER DENYING MOTION TO DISMISS THE INDICTMENT.**<br><br>**(ECF Nos. 41, 44, 47, 49, 57, 82–85.)** |

Before the Court is Defendant Brandon Kemmerer's Motion to Dismiss the Indictment. Mr. Kemmerer claims that dismissal is appropriate for two reasons: (1) that the Metropolitan Correctional Center's ("MCC") COVID-19 phone call policy resulted in a deprivation of his Sixth Amendment right to "free, confidential, no-contact communication with his Attorney," (ECF No. 41), and (2) that the Prosecutors in this matter indirectly engaged in misconduct by relying on a statement taken from Mr. Kemmerer by Ms. Theresa Talplacido, a senior attorney at MCC, outside the presence of his counsel and pertaining to his communications with counsel. (ECF Nos. 47, 57.)

For the reasons explained below, the Court concludes that no constitutional or ethical violation has occurred and **DENIES** Defendant's motions.

1

## I.   Procedural History

On April 3, 2020, Mr. Kemmerer filed a motion to dismiss the Indictment against him asserting that the Government violated his Sixth Amendment right by failing to provide a means for "free, confidential, no-contact communication with his Attorney." (ECF No. 41.) On April 8, 2020, the Government filed a response. (ECF No. 44.) The response included, among other documents, an inmate profile with Mr. Kemmerer's written statement on it. (ECF No. 44-3.)

On April 10, 2020, Mr. Kemmerer filed a reply. (ECF No. 47.) In addition to re-asserting that he lacked access to confidential communications with counsel, Mr. Kemmerer also asserted that the Government engaged in misconduct by obtaining a statement from Mr. Kemmerer about an issue being actively litigated outside the presence of his counsel. (*Id.* at 9–14.) On April 23, 2020, the Court accepted into the record the Government's sur-reply addressing the alleged misconduct. (ECF Nos. 49-1, 53.) On April 30, 2020, Mr. Kemmerer filed a response to the sur-reply. (ECF No. 57.)

On May 15, 2020, the Court issued an order granting Defendant's application for an evidentiary hearing regarding the alleged misconduct. (ECF No. 61.) The Court narrowed the grounds of the evidentiary hearing to three key issues: "(1) who obtained the note from Mr. Kemmerer, (2) when, why and how it was obtained, and (3) whether the note was obtained at the direction of the U.S. Attorney's Office or its investigating agents." (*Id.*) On May 27, 2020, the Government lodged with the court three items: Ms. Talplacido's declaration, Mr. Sagale's declaration, and a video recording of their interaction with Mr. Kemmerer on April 8, 2020. (ECF Nos. 63-1, 63-2, 63-3.)

On June 18 and 19, 2020, the Court held an evidentiary hearing. (ECF Nos. 76, 77, 83, 84.) Ms. Talplacido and Mr. Sagale both testified to facts pertinent to Mr. Kemmerer's motions to dismiss. (*Id.*) On June 26, 2020, Mr. Kemmerer filed additional brief seeking to supplement the evidence put forward at the hearing. (ECF No. 84.) On July 8, 2020, the Government filed a reply. (ECF No. 85.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**II.     Factual Background**

        **a.  MCC Policy on Confidential Communications Prior to March 13, 2020.**

        Prior to March 13, 2020, inmates at MCC could communicate with counsel via legal visits, in-court appearances, the inmate telephone, general mail, legal mail, and inmate email. (ECF No. 82 ("Tr. 1") at 59:7–11.) The MCC's practice was to document every contact an inmate had with counsel, regardless of the method. (*Id.* at 79:17–20.)

        If inmates wished to speak confidentially with their counsel, they would request a "scheduled confidential telephone call" through their counselor. (Tr. 1 at 13–21.) The inmate would be required to show an "imminent court deadline," though the MCC counselors do not strictly enforce that policy. (*Id.*) Alternatively, an inmate's counsel could also request a confidential call by emailing the "SDC Visiting email address" or Ms. Talplacido's Bureau of Prisons email address.[1] (*Id.* at 62:2–7.) These calls were unrecorded, though their occurrence was tracked in a logbook stored in each counselor's office. (*Id.* at 62:12–18.) Such calls were "rare." (*Id.* at 62:1.)

        Ms. Talplacido plays a critical role in these processes. In addition to advising the MCC's Warden on legal matters, Ms. Talplacido also serves as the MCC's liaison to the Court, the U.S. Attorney's Office, private defense counsel, and the Federal Defenders. (Tr. 1 at 57:11–25, 58:1–5.) In this capacity, Ms. Talplacido receives daily requests from defense counsel "for clarification of inmates' release date, anything to do with their inmate funds, mail, legal calls, visits, and so on." (Tr. 1 at 58:12–14.) She regularly communicates with counsel about their communications with inmates. (*Id.* at 58:15–17.)

---

[1] Here, the Court distinguishes between two addresses. The "SDC Visiting" email address is used to coordinate attorney contacts and "set up legal calls" at MCC. (Tr. 1 at 151:3–4.) Ms. Talplacido primarily operates this address, though sometimes other staff help if Ms. Talplacido forwards emails to them. (Tr. 1 at 88:17–22, 151:3–13.) Ms. Talplacido's BOP email address is the address assigned to her by BOP as their employee.

1  Ms. Talplacido has about nineteen years' experience working as an attorney for the

2  Bureau of Prisons. (*Id.* at 55:7–9.)

3      **b.  MCC Policy on Confidential Communications as of March 13, 2020.**

4      On March 13, 2020, the Bureau of Prisons suspended in-person legal visits to

5  minimize everyone's potential exposure to COVID-19. (Tr. 1 at 64:6–14.) As of the date

6  of the evidentiary hearing, legal visits were still suspended at the MCC. (*Id.* at 66:2–3.)

7      In response to the suspension of legal visits, Ms. Talplacido instructed defense

8  attorneys to submit requests for confidential calls via email to the SDC Visiting email

9  address. (Tr. 1 at 66:12–19.) Once Ms. Talplacido conveyed this new policy, (Gov't Ex.

10  1), the SDC Visiting email address began receiving 20–40 requests daily. (Tr. 1. at

11  67:19–25.) The MCC planned to host these calls in the offices of the inmates' counselors,

12  as was the protocol prior to March 13, 2020. (*Id.* at 68:2–4.) In Mr. Kemmerer's housing

13  unit, his counselor was assigned to 200 inmates and only had one phone. (*Id.* at 69 at 1–2,

14  98:16–18.) Ms. Talplacido explained that only one phone could be used because no other

15  phones in the housing units permitted phone calls to be placed outside of the facility. (*Id.*

16  at 69:13–19.) In addition, as to these calls, the MCC maintains a policy that the counselor

17  must observe the call to ensure unauthorized calls are not taking place. (*Id.* at 117–118.)

18      To alleviate the growing backlog of attorney–client calls, the MCC decided to

19  "install unmonitored phones in the housing units, where inmates could call directly to the

20  [defense] panel attorneys and the federal public defender's office, free of charge." (Tr. 1

21  at 13–16.) In late March and early April, Ms. Talplacido notified the Federal Defenders

22  that they were attempting to install unmonitored phones in the housing units and

23  requested the attorneys' phone numbers to be pre-programed into the phones for the

24  inmates to dial. (*Id.* at 120:22–25, 121:1–7, 152:22–25, 153:1–14.) The Federal

25  Defenders provided their main line number in response and the MCC programmed the

26  inmates' attorneys' numbers in on April 2, 2020. (Tr. 1 at 76:11–12, 83:18–22.) While

27  the unmonitored phones were being installed, the MCC continued to receive requests for

28

4

1    scheduled, confidential attorney calls. (*Id.* at 6–9.) Ms. Talplacido was the "only one

2    dealing with this issue," though she had some assistance from other MCC staff. (*Id.* at

3    77:18–19.)

4          On April 3, 2020, the MCC successfully installed the unmonitored phones in

5    housing units G and H. (Tr. 1 at 83:18–22.) In Mr. Kemmerer's housing unit, the

6    unmonitored phone was installed in "the common area of the housing unit," so that it

7    would be accessible to all inmates in the unit. (*Id.* at 83:25, 84:8–18.) More specifically,

8    the phone is located at the "periphery of the housing unit," against a column that has the

9    necessary wiring available, and which partially separates the phone from the general area

10   of the housing unit. (*Id.* at 85:1–8.) Once installed, the MCC sought to document

11   inmates' use of the unmonitored phones so that there would be "a record of the access the

12   inmate has with their attorney or the attorney making legal call requests." (Tr. 1 at 80:4–

13   9.) At the time, there was no established practice for doing so because the MCC had

14   never installed unmonitored phones. (*Id.* at 81:11–22.)

15         On April 8, 2020, the MCC first implemented a policy for tracking inmates'

16   contacts with counsel. (Tr. 1 at 93:13–17, 113:2–21.) The MCC decided to print out

17   attorney email requests for confidential calls, along with the inmates' profile sheets, "to

18   give to the [housing] unit manager" and their staff. (*Id.* at 82, 83.) Ms. Talplacido would

19   prepare these papers for each housing unit "first thing" in the morning for about an hour

20   and a half after arriving for her 6 a.m. shift at the MCC. (*Id.* at 85:9–16.) She received

21   permission from the Warden to use staff members from other departments of the MCC

22   because they were "trying to get as many legal calls as possible" given the backlog. (*Id.*

23   at 86:2–9.) After distributing the papers, each housing unit's staff would then assist the

24   inmates in making phone calls. (*Id.* at 86:13–24.) Ms. Talplacido testified that it was

25   "common" for staff and inmates alike to annotate these papers to verify that a legal call

26

27

28

1   had been made[2] and so that the papers could later be given "to the unit team secretary for

2   her to then note [the calls] into the logbook, the main logbook, for all the unmonitored

3   calls." (*Id.* at 86:13–25, 87:1–4.)

4       Ms. Talplacido testified that the MCC's "goal" in implementing this process "was

5   to get as many calls done and attempted or completed." (Tr. 1 at 158:11–12.) The system,

6   moreover, was intended to replace the confidential legal visits that had been suspended

7   by the Bureau of Prison. (*Id.* at 158:13–20.) Prior to COVID-19, those legal visits were

8   permitted for 13 hours per on Monday through Friday, as well as for certain times on

9   weekends, such that the MCC received 30–50 visits daily. (*Id.* at 59:12–25, 60:1–19.)

10      **c.  The Events Surrounding Mr. Kemmerer's Contact with Ms. Talplacido.**

11      On March 23, 2020, Ms. Talplacido received a request from Ms. Sandoval to speak

12  with her client, Mr. Kemmerer. (Tr. 1 at 94:9-10.) As of April 3, 2020, Ms. Talplacido

13  was still hearing from Ms. Sandoval that she had not spoken with Mr. Kemmerer. (*Id.* at

14  94:12-13.) On April 8, 2020, Ms. Talplacido went to Mr. Kemmerer's housing unit with

15  another MCC employee, Mr. Sagale, to see Mr. Kemmerer's counselor and "to attempt to

16  use unmonitored phones with inmates." (Tr. 1 at 94:12–24.) Ms. Talplacido considered

17  Mr. Kemmerer to be a "high priority" because she was unaware if he had yet spoken with

18  defense counsel, despite counsel's multiple requests from March 23, 2020 to April 3,

19  2020 for a legal call. (*Id.* at 94:2–14.) Ms. Talplacido put Mr. Kemmerer's call request on

20  top of the papers she was carrying (i.e., the inmate profile sheets and email call requests

---

[2] The record also contains various email requests with notations on them other than Mr. Kemmerer's. On cross, for example, defense counsel referred to two such call requests – one containing a notation stating, "Two attempts to contact attorney on 5/8/2020. No answer on both attempts," (Tr. 1 at 137:1–3), and another containing a notation stating, "no call complete." (*Id.* at 137:25.) Ms. Talplacido testified that neither document included an inmate's signature because no call was completed. (*Id.* at 137:4–5, 138:5–7.) The Parties stipulated that there are no call requests with signed notations before April 8, 2020. (*Id.* at 140:3–8.) On re-direct, government counsel referred the Court to two more such notations. Here, both notations indicate a call with counsel had been complete, note the corresponding date and time of the call, and included the respective inmate's signature. (*Id.* at 157:1–24.)

1   for the unit) "to make sure he was the first person to get a call." (*Id.* at 94:17–18, 100:19–

2   24.) Ms. Talplacido also wanted to show Mr. Sagale the unmonitored phones because she

3   was training him that day and he had never seen them. (*Id.* at 101:1–7.)

4          After Ms. Talplacido and Mr. Sagale arrived at the unmonitored phone, Mr. Sagale

5   called over Mr. Kemmerer. (Tr. 1 at 95:10–17.) As she waited for Mr. Kemmerer, she

6   observed a sheet had been posted next to the unmonitored phone with inmates' names on

7   it, including Mr. Kemmerer's name. (*Id.*) Once Mr. Kemmerer arrived, Ms. Talplacido

8   asked him if he knew how to use the phone and whether he knew his name was on the

9   posted list.[3] (*Id.* at 95:10–17, 101:18–16.) Mr. Kemmerer responded that he did and that

10  he had seen the list up for a few days. (Tr. 1 at 95:19–25, 101:17–19.) He also did not

11  need to make a call because he had already spoken with his attorney. (*Id.*)

12         As Mr. Kemmerer was getting ready to walk away, Ms. Talplacido asked him if he

13  would write down what he told her. (Tr. 1 at 102:4–9.) Specifically, Ms. Talplacido asked

14  Mr. Kemmerer to "write down that he already spoke (sic) to his attorney, and that he

15  knew about -- he saw the list and that's been up there a few days, and that he didn't need

16  any assistance with the unmonitored phone." (*Id.* at 96:11–14.) Though Ms. Talplacido

17  testified that she did not instruct Mr. Kemmerer what to write, she did acknowledge that

18  she told Mr. Kemmerer "Make sure that you put in there that the note has been up there,

19  meaning that your name was up there and you saw it," which was just what he had told

20  her in the beginning. (*Id.* at 103:9–11.) Ms. Talplacido also had Mr. Kemmerer sign the

21

22  _____

23  [3] The exchange described in this section was preceded by several emails between Ms. Talplacido and
    Mr. Kemmerer's counsel. Defense counsel reached out to the MCC to schedule a confidential call with

24  Mr. Kemmerer several times between March 23, 2020 and April 3, 2020. (Tr. 1 at 89:18–20.) Ms.
    Talplacido instructed defense counsel that Mr. Kemmerer would call her. (Id. 89:18–22.) That call did

25  not take place as planned, however, because of several delays internal to the MCC, including that Mr.
    Kemmerer's counselor was on leave for part of that period and that a 3-day quarantine occurred in the

26  housing unit because one of the inmates showed signs of COVID-19. (*Id.* at 90:2–9, 90:15–20.) When
    questioned, Ms. Talplacido stated that she was unaware if Mr. Kemmerer was ever permitted to make a

27  call from his counselor's office. (*Id.* at 119:11–20.)

28

document and include his register number "to acknowledge it was him that wrote the note and not [her] or Mr. Sagale." (Tr. 1 at 102:10–11, 103:21–22.)

As demonstrated by the video recording of this exchange, (Gov't Ex. 10), and Mr. Kemmerer's inmate profile sheet with his written statement, Mr. Kemmerer then wrote:



(ECF No. 44-3 at 2; Gov't Ex. 9.) Ms. Talplacido explained that she asked Mr. Kemmerer to write the note so that she could inform the unit secretary that Mr. Kemmerer did not need to be scheduled for another call and so that his call could be logged in the logbook. (Tr. 1 at 96:19–24.) She, moreover, "felt that [Mr. Kemmerer] should document" his statements to her because she did not see him use the phone. (*Id.* at 96:4–7.) She also stated that this process was "all new" and that she "was not prepared for how he would react." (*Id.* at 102:10–19.) Nonetheless, she felt she the exchange was "very proper." (*Id.*) Ms. Talplacido testified that, during this interaction, she did not ask Mr. Kemmerer about the facts of his underlying case or the substance of his communications with counsel. (*Id.* at 152:6–12.)

After Mr. Kemmerer left, Ms. Talplacido interacted with another inmate at the unmonitored phone. (Tr. 1 at 104:2–5.) She called over another officer to help translate for her as this inmate spoke to her in Spanish. (*Id.* at 104:6–17.) With the translating officer's assistance, Ms. Talplacido spoke with the inmate and instructed him to come back later when his attorney called. (*Id.* at 105:10–18.) Ms. Talplacido did not instruct that other inmate to make a note on his inmate profile sheet because he had not completed a call or told her that he had already spoken with his attorney. (*Id.* at 24–25.) Ms. Talplacido then left all the call papers with Mr. Sagale who was to remain there that day to assist other inmates in making their calls. (*Id.* at 106:9–17.)

On April 7, 2020, day before Ms. Talplacido's interaction with Mr. Kemmerer, Assistant U.S. Attorney ("AUSA") Seth Askins emailed Ms. Talplacido at 8:03 p.m. requesting "all correspondence between [defense counsel] and MCC personnel regarding [Mr. Kemmerer]?". (Tr. 1 at 1–8; Gov't Ex. 11.) The subject of the email includes the terms, "Request for Assistance" and "TIME SENSITIVE." (Tr. 1 at 129:8–10.) The body of the email then notes that Mr. Kemmerer had moved to dismiss his prosecution because he alleged being unable to have confidential meetings and correspondence with counsel. (*Id.* at 129 at 11–23.) In addition, the email makes one specific request: "Would it be possible for you to provide [the Government] with all correspondence between [defense counsel] and MCC personnel?". (Gov't Ex. 11.) The email also attached copies of emails that Mr. Kemmerer had included as exhibits to his motion to dismiss. (Tr. 1 at 149:4–16.)

Ms. Talplacido testified that she did not open this email prior to speaking with Mr. Kemmerer. (*Id.* at 112:2–9.) Ms. Talplacido further testified that she had no communications whatsoever with AUSA Askins or any other member of the U.S. Attorney's office about Mr. Kemmerer before speaking to him. (*Id.* at 109:2–16, 126:4–8.) She also testified that Government counsel did not ask her to contact Mr. Kemmerer or interact with him. (*Id.* at 108:18–23.) And, she was unaware Mr. Kemmerer had filed a motion before the court alleging a lack of access to counsel when she spoke to him. (*Id.* at 16:19–25, 127:1–19.)

After interacting with Mr. Kemmerer on April 8, 2020, Ms. Talplacido returned to her office and then responded to Mr. Askins's email. (Tr. 1 at 111:4–8.) She first "open[ed]" Ms. Askins's email "around 9:10, 9:15 that morning" while "going through [her] personal BOP email." (*Id.* at 112:2–9.) Ms. Talplacido testified that, during the "first part of the [COVID-19] shutdown," she "typically" did not check her BOP email address until "9:00 or 9:30 a.m." (*Id.* at 150:3–16.) She instead checked the SDC Visiting email address each morning after getting in. (*Id.*) She also did not usually check her email after leaving work, at least not around 8:00 p.m. because she "go[es] to bed around that

9

time." (*Id.*) Ms. Talplacido testified that she did not speak to anyone from the U.S. Attorney's office on the phone prior to responding to AUSA Askins's email. (*Id.* at 111:9–20, 112:12–15, 126:22–25, 127:1–3.)

In the weeks preceding the evidentiary hearing, the Government also filed declarations from Ms. Talplacido and Mr. Tracy Sagale, an employee of MCC. (ECF No. 63.) These declarations broadly comport with Ms. Talplacido's testimony. On cross-examination, the defense developed that Ms. Talplacido's declaration did not explain that she had not reviewed AUSA Askins's email before speaking to Mr. Kemmerer. (Tr. 1 at 145:2–7.) Mr. Sagale testified that Ms. Talplacido assisted him in preparing his declaration, and that his declaration includes facts regarding her communications with the U.S. Attorneys' Office to which he lacked personal knowledge. (Tr. 1 at 164:9–14; ECF No. 83 ("Tr. 2") at 6:1–22.)) Mr. Sagale also explained that, before drafting his declaration, he had written down "notes" for himself on "blank" "memorandum" paper with the "BOP logo on top." (Tr. 1 at 165:1–2; Tr. 2 at 4:13–23.) He then disposed of the notes so that they could not be produced at the hearing and acknowledged on cross-examination that Ms. Talplacido did not tell him to hold on to them. (Tr. 2 at 7:6–9.) Also, Mr. Sagale testified that Ms. Talplacido "said something along [the] lines" that it was urgent that they speak with Mr. Kemmerer. (Tr. 1 at 164:1–10.)

## III.   Legal Standard

### a.   Whether a Prison Policy Infringes on a Criminal Defendant's Sixth Amendment Right to Confidential Communications with Counsel.

In assessing whether a prison regulation or policy infringes an inmate's constitutional rights, courts of the Ninth Circuit typically apply the *Turner* test. *Mauro v. Arpaio*, 188 F.3d 1054, 1058–59 (9th Cir. 1999) (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987)); *see also First Amendment Coal. of Arizona, Inc. v. Ryan*, 938 F.3d 1069, 1077 (9th Cir. 2019) (considering under *Turner* whether plaintiff's First Amendment rights were violated by, among other policies, Arizona's policy restricting the ability of

10

execution witnesses to hear the sounds of the entire execution process); *Gerber v. Hickman*, 291 F.3d 617, 620 (9th Cir. 2002) (considering under *Turner* whether state prison violated plaintiff's constitutional rights "by not allowing him to provide his wife with a sperm specimen that she may use to be artificially inseminated").

Indeed, the Supreme Court noted thirty years ago that *Turner* "applies to all circumstances in which the needs of prison administration implicate constitutional rights." *Washington v. Harper*, 494 U.S. 210, 224 (1990); *but see Johnson v. California*, 543 U.S. 499, 500 (2005) (noting that "the right not to be discriminated against based on one's race is not susceptible to *Turner's* logic because it is not a right that need necessarily be compromised for the sake of proper prison administration"). Under *Turner*, a court "must consider four factors: (1) whether there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether the impact of accommodating the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally; and (4) whether the policy is an 'exaggerated response' to the jail's concerns." *Mauro*, 188 F.3d at 1058–59.

In *Nordstrom I*, the Ninth Circuit recognized that a prison regulation's impact on a criminal defendant's Sixth Amendment rights might called for a slightly different approach. *Nordstrom v. Ryan* ("*Nordstrom I*"), 762 F.3d 903, 909 (9th Cir. 2014). The *Nordstrom I* Court observed that "[c]ourts also have recognized that 'while most cases brought by prisoners are civil . . . [a] practice of prison officials reading mail between a prisoner and his lawyer in a criminal case would raise serious issues under the Sixth Amendment . . . which guarantees a right to counsel in criminal cases.'" *Id.* (quoting *Guajardo–Palma v. Martinson*, 622 F.3d 801, 803 (7th Cir. 2010)); *see also Merriweather v. Zamora*, 569 F.3d 307, 317 (6th Cir. 2009) (recognizing that interference with legal mail implicates Sixth Amendment); *Altizer v. Deeds*, 191 F.3d

11

1   540, 549 n.14 (4th Cir. 1999) (recognizing that the Sixth Amendment may be implicated

2   by interference with an inmate's right to communicate freely with his attorney in a

3   criminal case). Thus, in considering the government's alleged interference with an

4   inmate's communications with counsel during the appeal of his conviction, the

5   *Nordstrom I* panel analyzed plaintiff's claims under the Sixth Amendment and not under

6   *Turner. Nordstrom I*, 762 F.3d at 909.

7   Criminal defendants have a Sixth Amendment right to assistance of counsel.

8   *Gideon v. Wainwright*, 372 U.S. 335, 339–41 (1963). A "criminal defendant's ability to

9   communicate candidly and confidentially with his lawyer is essential to his defense."

10   *Nordstrom I*, 762 F.3d at 910; *see also Adams v. Carlson*, 488 F.2d 619, 631 (7th Cir.

11   1973) (acknowledging "widespread agreement that communications by post between an

12   inmate and his attorney are sacrosanct . . ."); *Coplon v. United States*, 191 F.2d 749, 757

13   (D.C. Cir. 1951) (noting that "[i]t is well established that an accused does not enjoy the

14   effective aid of counsel if he is denied the right of private consultation with him.") Thus,

15   a jail cannot arbitrarily "deny[] a prisoner contact visits with his attorney" because doing

16   so "prohibits effective attorney-client communication and unnecessarily abridges the

17   prisoner's right to meaningful access to the courts." *Ching v. Lewis*, 895 F.2d 608, 610

18   (9th Cir. 1990). Likewise, prison officials are not permitted to read inmates'

19   correspondence, except to "confirm that it does not include suspicious features such as

20   maps" and to make "sure that illegal goods or items that pose a security threat are not

21   hidden in the envelope." *Nordstrom v. Ryan* ("*Nordstrom II*"), 856 F.3d 1265, 1272 (9th

22   Cir. 2017).

23   "When the government deliberately interferes with the confidential relationship

24   between a criminal defendant and defense counsel, that interference violates the Sixth

25   Amendment right to counsel if it substantially prejudices the criminal defendant."

26   *Williams v. Woodford*, 384 F.3d 567, 584–85 (9th Cir. 2004) (citing *Clutchette v. Rushen*,

27   770 F.2d 1469, 1471 (9th Cir. 1985); *Weatherford v. Bursey*, 429 U.S. 545, 557–58

28

12

1   (1977)). "Substantial prejudice results from the introduction of evidence gained through

2   the interference against the defendant at trial, from the prosecution's use of confidential

3   information pertaining to defense plans and strategy, and from other actions designed to

4   give the prosecution an unfair advantage at trial. *Id.* at 585 (citing *United States v. Irwin*,

5   612 F.2d 1182, 1187 (9th Cir. 1980)).

6           **b. Motion to Dismiss Indictment for Prosecutorial Misconduct**

7           A district court may dismiss an indictment on the ground of outrageous

8   government conduct if the conduct amounts to a due process violation." *United States v.*

9   *Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004), *on reh'g in part*, 138 F. App'x 902 (9th Cir.

10  2005) (citing *United States v. Simpson*, 813 F.2d 1462, 1464–65 (9th Cir. 1987)). This

11  power is derived from the Supreme Court's opinion in *United States v. Russell*, 411 U.S.

12  423 (1973), which recognized that there may be situations "in which the conduct of law

13  enforcement officials is so outrageous that due process principles would absolutely bar

14  the Government from invoking judicial process to obtain a conviction." *United States v.*

15  *Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (quoting *Russell*, 411 U.S. at 431–32).

16          To establish outrageous government conduct, defendants must show conduct that

17  violates due process in such a way that it is "so grossly shocking and so outrageous as to

18  violate the universal sense of justice." *Id.* at 712 (quoting *United States v. O'Connor*, 737

19  F.2d 814, 817 (9th Cir.1984)) (internal quotation marks omitted); *United States v.*

20  *Stinson*, 647 F.3d 1196, 1210 (9th Cir. 2011). The defense is therefore "limited to

21  extreme cases in which the government's conduct violates fundamental fairness." *United*

22  *States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003).

23          A court may also dismiss an indictment under its supervisory powers. *United*

24  *States v. Barrera–Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991). This form of dismissal

25  "requires (1) flagrant misbehavior and (2) substantial prejudice," *United States v. Kearns*,

26  5 F.3d 1251, 1253–54 (9th Cir. 1993), and is appropriate "to remedy a constitutional or

27  statutory violation; to protect judicial integrity by ensuring that a conviction rests on

28

                                                    13

1   appropriate considerations validly before a jury; or to deter future illegal conduct."

2   *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (quotation omitted); *but see*

3   *United States v. W.R. Grace*, 526 F.3d 499, 511 n. 9 (9th Cir. 2008) (en banc) (noting that

4   a court's supervisory powers include, but are not limited, to these three areas).

5   **IV.   Whether Mr. Kemmerer's Right to Communicate Confidentially with**

6   **Counsel was Violated by the MCC's COVID-19 Phone Call Policy.**

7   Mr. Kemmerer challenges the MCC's alleged policy[4] of allowing "only . . . for

8   pre-arranged calls, which are limited to 30 minutes each," and which do not permit

9   "confidential" communication to occur. (ECF No 47 at 4.) The Parties address Mr.

10  Kemmerer's challenge under the four-factor *Turner* standard. (ECF No. 44 at 8–11; ECF

11  No. 47 at 3–8.) However, as noted above, the Ninth Circuit recently addressed a

12  challenge to a confidential communication under the two-factor Sixth Amendment

13  standard. *Nordstrom I*, 762 F.3d at 910. Thus, given *Nordstrom*, and Mr. Kemmerer's

14  argument that *Turner*'s "penological interest test is 'perhaps a poor fit for pretrial

15  detention as opposed to post-sentencing imprisonment,'" (ECF No. 47 at 8 (quoting

16  *Mauro*, 188 F.3d at 1066–72 (9th Cir. 1999) (Kleinfield, J., dissenting)), the Court

17  addresses Mr. Kemmerer's challenge under both standards.

18  Finding no violation of Mr. Kemmerer's constitutional right to communicate

19  confidentially with his attorney under either *Nordstrom I* or *Turner*, the Court **DENIES**

20  Mr. Kemmerer's motion.

21

22

23

24  [4] At the evidentiary hearing, the Government produced a memorandum drafted by Ms. Talplacido that
    instructed the defense community as to this policy. With respect to the new policy on "confidential

25  calls" the memorandum states: "Monitored legal calls for indigent inmates or for confidential calls on an
    as-available basis, please email your request to [the SDC Visiting email address]. You need to provide

26  your office number and dates and times of availability. Legal calls will be made according to the staff's
    schedules and availability. Due to increased demand for legal calls, we need 48 to 72 hours' notice.

27  Same-day request is not reasonable at this time." (Tr. 1 at 66:12–19; Gov't Ex. 1.)

28

1

      **a.  Analysis Under *Nordstrom I***

2

      Mr. Kemmerer's challenge boils down to a straightforward question: did the

3

MCC's call policy infringe his right to communicate confidentially with counsel between

4

March 13, 2020 and May 1, 2020[5]? Because the facts do not support an inference that the

5

MCC "deliberately interfered" with Mr. Kemmerer's attorney-client relationship, or show

6

how Mr. Kemmerer has been prejudiced by this temporary delay in communicating with

7

counsel, the Court finds that Mr. Kemmerer's Sixth Amendment right to counsel has not

8

been violated and thus denies the motion.

9

      First, the Court concludes that the MCC's policy did not "deliberately interfere

10

with the confidential relationship between [Mr. Kemmerer] and defense counsel."

11

*Williams*, 384 F.3d at 584–85. As Ms. Talplacido explained in her testimony, the Bureau

12

of Prisons suspended in-person legal visits to minimize everyone's potential exposure to

13

COVID-19. (Tr. 1 at 64:6–14.) In response, the MCC continued its policy of permitting

14

confidential, attorney-client calls via the phone located in each inmate's unit counselor's

15

office upon request of counsel, and then communicated the availability of such calls to

16

the defense community in a written memorandum. (Tr. 1 at 69:5–22; Gov't Ex. 1.) This

17

policy was intended to "ensure that defense counsel and inmates would be able to

18

continue to communicate" despite the cessation of legal visits. (Tr. 1 at 64:15–18.) And,

19

when the incoming number of requests – notably, as many as 40 per day – proved

20

"overwhelming," (Tr. 1 at 67:19–25), the MCC took the added step of adopting the

21

unmonitored phone system to help.

22

      Second, even assuming *arguendo* that the MCC's response was "deliberate" within

23

the meaning of *Williams*, Mr. Kemmerer has failed to explain how this policy

24

25

---

26

[5] On May 1, 2020, the Government filed a notice that it had approved Mr. Kemmerer's bond package and anticipated that he would be released that day. (ECF No. 58 at 2.) Consequently, Mr. Kemmerer was no longer subject to the MCC policy issue after Mary 1, 2020.

27

28

1   "substantially prejudiced" his defense. *Williams*, 384 F.3d at 584–85. For example, Mr.

2   Kemmerer has not articulated how being unable to speak to his attorney confidentially for

3   six weeks has "give[n] the prosecution an unfair advantage at trial" or permitted them to

4   obtain "confidential information pertaining to defense plans and strategy." *Id.*; *see also*

5   *Pierce v. Lopez*, No. ED-CV-11-0641-GAF, 2013 WL 2317995, at *16 (C.D. Cal. May

6   28, 2013) (finding that a prosecutor eavesdropping on a conversation between defendant

7   and counsel did not amount to a violation of the right to counsel "without a showing of

8   prejudice").

9          Rather, Mr. Kemmerer argues that he "spent weeks in punitive custody at a time

10  when he was presumed innocent" and that, "[d]uring this time, Mr. Kemmerer and

11  defense counsel [were not] able to discuss Mr. Kemmerer's pre-trial motions, upcoming

12  evidentiary hearing, or defense at trial." (ECF No. 41 at 10.) While these assertions may

13  be true, they do not establish substantial prejudice here. The Court is not prepared to find

14  that Mr. Kemmerer's detention alone creates "substantial prejudice" because his

15  detention was not the result of the MCC's policy. In addition, that Mr. Kemmerer was

16  unable to communicate confidentially with his attorney has not had the impact that

17  counsel suggests. No evidentiary hearing took place before May 1, 2020, Mr.

18  Kemmerer's pre-trial motions were not denied during his time in custody, and his trial

19  has yet to go forward. And, as a practical matter, Mr. Kemmerer could have

20  communicated confidentially with counsel through other means during this six-week

21  period, including through mail and email. *See Hernandez v. McDowell*, No. 5:17-CV-

22  01786-PSG, 2020 WL 2115450, at *4 (C.D. Cal. Mar. 9, 2020) (concluding that

23  petitioner was not substantially prejudiced by being unable to talk privately with trial

24  counsel in the courtroom's jury box given the presence of third parties because that was

25  "not the only place" to speak with counsel and because he did not identify what

26  confidential information was intercepted by the government).

27

28

1    Consequently, Mr. Kemmerer has not shown how the MCC's call policy in

2    response to COVID-19 violated his Sixth Amendment right to counsel.

3         **b.  Analysis Under *Turner***

4         The Court reaches the same conclusion under *Turner*. As noted, *Turner* requires

5    the Court to engage in a deferential reasonableness assessment of the regulation or policy

6    being challenged through the lens of four distinct factors: "(1) whether there is a rational

7    connection between the regulation and a legitimate and neutral government objective; (2)

8    whether alternative means of exercising the right remain available to inmates; (3) the

9    impact accommodation of the asserted constitutional right will have on guards and other

10   inmates, and on the allocation of prison resources; and (4) whether the existence of

11   obvious, easy alternatives to the regulation indicate that it is an exaggerated response to

12   prison concerns." *Crime Justice & Am., Inc. v. Honea*, 876 F.3d 966, 972 (9th Cir. 2017).

13   "The burden is on the inmates to show that the challenged regulation is unreasonable

14   under *Turner*." *Casey v. Lewis*, 4 F.3d 1516, 1520 (9th Cir. 1993). Applying these

15   factors, the Court finds that the MCC's policy is "reasonably related to a legitimate

16   penological objective and therefore does not violate" Mr. Kemmerer's constitutional

17   rights. *Id.* at 978.

18        First, there is a "valid, rational connection" between the MCC's policy and the

19   prison's objectives. *Turner*, 482 U.S. at 89. Ms. Talplacido's memorandum makes clear

20   that, the limitations imposed by the policy – i.e., that "legal calls will be made according

21   to the staff's schedules and availability" and that calls need to be requested with "48–72

22   hours notice"[6] – were necessary to accommodate the "increase[d] demand for legal

23   _____

24
25   [6] In his initial reply, Mr. Kemmerer asserted that the MCC policy also included a 30-minute time limit.
     (*See* ECF No. 47 at 6.) However, the memorandum produced at the hearing stating the policy does not
26   include that limitation. (Gov't Ex. 1.) While it is possible someone conveyed such a limitation to Mr.
     Kemmerer's counsel at the time, or that as a practical matter calls were being limited by MCC staff so
27   other inmates could have access to the phone, the Court does not consider this here given its absence
     from the stated policy and Ms. Talplacido's testimony regarding the policy.

28                                          17

1   calls." (Tr. 1 at 66:12–19; Gov't Ex. 1.) As Ms. Talplacido explained, there was only one

2   telephone in each housing unit on which attorney-client calls could occur. (Tr. 1 at 69:8–

3   12.) "[O]ther phones within the housing unit . . . don't call out to the outside. [They are]

4   just internal to MCC." (Tr. 1 at 69:13–22.) As a result, each phone supported the attorney

5   call requests of as many as 200 inmates. (Tr. 1 at 69:1–2.) Some limitation was

6   reasonable to try to provide phone access to so many inmates.

7       In addition, "Bureau of Prisons do not allow inmates access to an open telephone

8   line by themselves." (Tr. 1 at 116:9–10.) An inmate's call must take place with "staff

9   supervision or observation." (Tr. 1 at 116:12.) Consequently, the phone cannot be used at

10  all times of day because a staff member is required to observe the attorney–client call to

11  ensure the inmate does not hang up on his attorney and then "call[] someone else,"

12  including a potential "confederate." (Tr. 1 at 118:4–12.) The policy limitation is

13  rationally related to this legitimate concern. *See Crime Justice & Am., Inc.*, 876 F.3d at

14  973 (finding that the prison policy prohibiting receipt of unsolicited commercial mail was

15  rationally related to the objective of "promoting jail security" because the paper could be

16  used "improperly to compromise jail security").

17      Second, despite the phone call policy's limitations, "there [we]re alternative means

18  of exercising the right that remain[ed] open to prison inmates." *Turner*, 482 U.S. at 90.

19  For example, as the subject policy confirms, inmates had access to email and legal mail.

20  (Gov't Ex. 1.) And, there is no reason to conclude the either avenue was not private. *See*

21  *Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977) ("the Sixth Amendment's

22  assistance-of-counsel guarantee can be meaningfully implemented only if a criminal

23  defendant knows that his communications with his attorney are private . . ."). In addition,

24  while the Court understands Mr. Kemmerer was unable to obtain a call after his counsel

25  made several requests between March 23, 2020 and April 3, 2020, (ECF No. 57-1 at ¶¶

26  6–14), this can be explained in part by circumstances specific to his housing unit. (*See* Tr.

27  1 at 90:2–9 (explaining that "few things happening in that housing unit at that time,"

28

18

1   including "a quarantine in the unit" and Mr. Kemmerer's "counselor [going] on leave for

2   a week"). And, Mr. Kemmerer's experience notwithstanding, the MCC policy permitted

3   inmates to make confidential calls, which staff scheduled while Mr. Kemmerer was in

4   custody. (Tr. 1 at 72:15–25.) Thus, when "viewed sensibly and expansively," Mr.

5   Kemmerer's right to communicate confidentially with counsel could have been exercised

6   through at least three other avenues: emails, legal mail, and a scheduled phone call. *See*

7   *Thornburgh*, 490 U.S. at 417 (quotation omitted).

8          Third, Mr. Kemmerer does not show how accommodating his request would have

9   had a minimal impact "guards and other inmates, and on the allocation of prison

10   resources generally." *Turner*, 482 U.S. at 90. To the contrary and given the limitations of

11   the MCC's phones at the time COVID-19 hit, accommodating Mr. Kemmerer's request

12   for "free, confidential, no-contact communication" comparable to that of a legal visit,

13   (ECF No. 41 at 1), would have required the MCC to, at a minimum, install new phones

14   capable of making calls out of the prison, re-purpose an already burdened staff to assist

15   with these calls, and ensure that the operation of these phones aligned with prison policy.

16   The Court is not well-positioned to assess the difficulty of that endeavor or to second-

17   guess the MCC's decision to not do so. *See Mauro*, 188 F.3d at 1058 (quoting *Turner*,

18   482 U.S. at 84–85) ("Running a prison is an inordinately difficult undertaking that

19   requires expertise, planning, and the commitment of resources, all of which are peculiarly

20   within the province of the legislative and executive branches of government.") As in

21   *Casey*, the Court is not convinced that the potential costs and operational difficulties

22   involved in accommodating Mr. Kemmerer's requests were reasonable, especially

23   because Mr. Kemmerer's right to communicate confidentially with his attorney was not

24   "denied in its entirety". *See Casey v. Lewis*, 4 F.3d 1516, 1522 (9th Cir. 1993) (finding a

25   policy prohibiting contact visits for certain inmates did not deny those inmates'

26   "constitutional right of meaningful access").

27

28

3:19-CR-02513-GPC

1    Lastly, the Court does not find that the instant rule was an "exaggerated response"

2    to prison concerns. *Turner*, 482 U.S. at 90. "It is incumbent upon the prisoners to point to

3    an alternative that accommodates their rights at de minimis cost to security interests."

4    *Casey*, 4 F.3d at 1523 (citing *Turner*, 482 U.S. at 91). In his pre-hearing briefing, Mr.

5    Kemmerer offers that he "has no reason to believe it would cost more for the MCC to

6    schedule appointments for attorney-client phones calls, to allow them to occur in a more

7    expedited manner, to be longer than 30 minutes, and to ensure they are confidential."

8    (ECF No. 47 at 7–8.) These suggestions, however, do not reasonably account for the

9    MCC's phone system or the high volume of call requests that overwhelmed the MCC's

10   internal policy response. (Tr. 1 at 67:19–25). These suggestions also do not offer a

11   comparison of how other districts have handled attorney communications during COVID-

12   19 or adequately account for the challenges created by COVID-19. *See Hrdlicka v.*

13   *Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011) (considering how publication banned in two

14   prisons was distributed in other countries). And, they fail to recognize that the MCC did

15   implement an alternative – the unmonitored phones – even if that alternative was not as

16   confidential as Mr. Kemmerer would have liked. Consequently, the Court does not find

17   that the MCC's limitations on phone calls were an "exaggerated response" to the

18   difficulties presented by COVID-19.

19   In sum, having considered the *Turner* factors, the Court reaches the same

20   conclusion as it did under *Nordstrom I*: Mr. Kemmerer's right to communicate

21   confidentially with counsel was not infringed by being subjected to the MCC's limited

22   restrictions on making phone calls over a six-week period.

23   **V.   Whether the Government Committed Misconduct Warranting Dismissal of**

24   **the Instant Prosecution**

25   Mr. Kemmerer also argues that the Government engaged in prosecutorial

26   misconduct by relying on a statement obtained from Mr. Kemmerer by Ms. Talplacido

27   outside the presence of counsel. (ECF No. 47 at 9–14; ECF No. 57 at 5–8.) This conduct

28

20

1   allegedly violates both Mr. Kemmerer's right to counsel and California Rule of

2   Professional Conduct 4.2. (*Id.*) As a result, Mr. Kemmerer urges the Court to dismiss the

3   instant indictment, either as "prosecutorial misconduct based on constitutional grounds,

4   or by exercising its supervisory power." (ECF No. 497 at 9.)

5           Finding that the Government did not indirectly engage in misconduct vis-à-vis Ms.

6   Talplacido's contact with Mr. Kemmerer, the Court **DENIES** Mr. Kemmerer's motion.

7         **a. No Violation of California Professional Rule of Conduct 4.2**

8           Rule 4.2(a)[7] states that, "[i]n representing a client, a lawyer shall not communicate

9   directly or indirectly about the subject of the representation with a person the lawyer

10   knows to be represented by another lawyer in the matter, unless the lawyer has the

11   consent of the other lawyer." CA Rule of Prof'l Conduct 4.2(a). This rule "shields a

12   party's substantive interests against encroachment by opposing counsel and safeguards

13   the relationship between the party and her attorney." *United States v. Lopez*, 4 F.3d 1455,

14   1459 (9th Cir. 1993); *see also United States v. Talao*, 222 F.3d 1133, 1138 (9th Cir.

15   2000) (noting that the rule exists "to establish ethical standards that foster the internal

16   integrity of and public confidence in the judicial system"). In applying Rule 4.2, context

17   matters and the Court renders a fact-specific decision. *See United States v. Kenny*, 645

18   F.2d 1323, 1339 (9th Cir. 1981) (deciding in light of the specific "factual setting" at issue

19   that it was not an ethical violation for prosecutor to play at trial "a tape recording of a

20   telephone conversation between government informant and one defendant" allegedly

21   obtained in violation of the no-contact rule).

22           Here, Mr. Kemmerer argues that Government "indirectly" communicated with him

23   regarding "the subject of [his] representation" when it filed "Mr. Kemmerer's declaration

---

[7] Mr. Kemmerer makes an argument in passing that the Government also violated California Professional Rule of Conduct 4.4. (ECF No. 57 5 n.2.) Because this Rule governs the inadvertent disclosure of privileged materials, it is a poor fit for the facts at hand. Defendant acknowledges that it is not "directly on point" and the Court agrees. (*Id.*)

as an exhibit and used [it] in its Response" to Mr. Kemmerer's motion to dismiss. (ECF No. 57 at 5–7.) Thus, Mr. Kemmerer's argument is predicated on the assertion that Ms. Talplacido "violated Rule [4.2] by obtaining a written, signed declaration from Mr. Kemmerer regarding his confidential communications with his attorney without the consent of his defense counsel." (ECF No. 47 at 10–11.) The Government argues, in response, that Ms. Talplacido did nothing improper, (ECF No. 49-1), and offers additional arguments in their post-hearing briefing asserting that any misconduct cannot be attributed to the Prosecutors in this matter, even if the Court were to find that Ms. Talplacido violated Rule 4.2. (ECF No. 85 at 3–12.) Considering the context in which Ms. Talplacido's contact with Mr. Kemmerer took place, and her credible testimony regarding why and how she spoke with Mr. Kemmerer, the Court concludes that Mr. Kemmerer's circumstantial argument is unpersuasive and thus finds that Ms. Talplacido did not violate Rule 4.2. Accordingly, the Court does not address the Government's other contentions regarding Rule 4.2.

As an initial matter, the Court recognizes that Mr. Kemmerer's argument is not frivolous. On April 8, 2020, Ms. Talplacido, an attorney, spoke to Mr. Kemmerer, outside the presence of his counsel, about his access to his attorney, a matter that was currently being litigated before this Court. Ms. Talplacido had received an email the evening prior, at 8:03 p.m., from the AUSA Askins seeking her assistance in obtaining correspondence between defense counsel and the MCC to follow-up on Mr. Kemmerer's pending motion. (Tr. 1 at 1–8; Gov't Ex. 11.) The email reads as urgent given its subject line and content. (Tr. 1 at 129:8–23; Gov't Ex. 11.) Ms. Talplacido, moreover, coincidentally decided to implement a new process for tracking attorney calls on the morning of April 8, 2020 and began the process with Mr. Kemmerer. (Tr. 1 at 93:13–17, 94:17–18, 100:19–24, 113:2–21.)

Mr. Kemmerer encourages the Court to view these facts with skepticism and to conclude that Ms. Talplacido's testimony regarding her motivations for speaking with

1    Mr. Kemmerer is not credible. (ECF No. 143 at 14–17.) Mr. Kemmerer highlights, for

2    example, that his statement reads like a declaration taken in an adversarial context as it

3    bears his signature and inmate number. (*Id.*) Mr. Kemmerer also observes that it is

4    unbelievable that Ms. Talplacido would have not checked her BOP email address when

5    checking the SDC Visiting email address on the morning of April 8, 2020. (*Id.*) And, Mr.

6    Kemmerer points to the differences between his statements and those collected

7    subsequently from other inmates, namely, that his is more detailed and specifically

8    addresses an issue being litigated. (*Id.*)

9            In addition, Mr. Kemmerer highlights Mr. Sagale's testimony[8] and various

10   concerns regarding the declarations addressing April 8, 2020. These concerns include that

11   Ms. Talplacido's declaration failed to note she had not reviewed AUSA Askins's email

12   before speaking to Mr. Kemmerer. (Tr. 1 at 145:2–7.) Mr. Sagale also testified that Ms.

13   Talplacido assisted him in preparing his declaration, and that his declaration includes

14   facts regarding her communications with the U.S. Attorneys' Office to which he lacked

15   personal knowledge. (Tr. 2 at 6:19–22.) Ms. Talplacido, moreover, did not tell Mr. Sagale

16   to preserve the notes he relied on in preparing his declaration. (Tr. 2 at 7:2–9.) Lastly,

17   Mr. Kemmerer emphasizes that Mr. Sagale recalled "the urgency for speaking with Mr.

18   Kemmerer on April 8 was that Mr. Kemmerer was being denied access to counsel." (Tr. 2

19   at 17:1–2.)

20           Certainly, these facts provide some basis, even if only circumstantial, for finding

21   Ms. Talplacido reviewed Mr. Askins's email before she contacted Mr. Kemmerer on

22   April 8, 2020. However, these circumstances do not tell the whole story. The totality of

23   the circumstances reveal that from March 13, 2020 through April 8, 2020, Ms. Talplacido

24

25   _____

26   [8] The Government stressed at the hearing that it did not rely on Mr. Sagale's declaration for its
     argument. Nonetheless, it submitted his declaration and Mr. Sagale then testified. Consequently, the
27   Court considers it here.

28                                                   23

1    was attempting to respond to unprecedented events and seeking to accommodate the need

2    for defense counsel to consult with their clients following the suspension of legal visits.

3        At that time, the MCC and Ms. Talplacido, specifically, were trying to adapt

4    rapidly to a complex pandemic. The pressures created by COVID-19 – including

5    quarantines, changing BOP policies, and a shortage of staff – forced the MCC to adopt

6    new measures like the unmonitored phones. (Tr. 1 at 64:6–14; 70:1–3, 90:2–9.) As Ms.

7    Talplacido testified, the unmonitored phones were intended to alleviate the challenges

8    posed by the pandemic to the MCC as well as its inmate population including, as is

9    relevant here, the inability for the MCC to host contact visits which prior to COVID-19

10   ranged from 30 to 50 visits daily. (Tr. 1 at 59:19–24, 70:8–22.) At that point, the

11   attorney-client call backlog has grown so much that "Associate Warden Gonzalez and the

12   warden had authorized [Ms. Talplacido and her team] to use staff members from the

13   facilities department, safety department, chaplain, [and] the education department" to

14   execute this new program. (Tr. 1 at 86:5–8.) Unmonitored phones, moreover, had never

15   been used at the MCC and there was no established policy for logging inmates' calls in

16   this context, as is MCC policy. (Tr. 1 at 79:17–20; 81:11–22.) This context helps explain

17   why, for example, the notes taken from other inmates after April 8, 2020 differ in detail

18   to Mr. Kemmerer's notes. It also helps explain the timing of the logging policy, which

19   was adopted only days after the phones were first installed in Mr. Kemmerer's housing

20   unit. (Tr. 1 at 83:18–22, 93:13–17.)

21       The Court is likewise mindful of the critical role Ms. Talplacido played in leading

22   the MCC's efforts to adjust to the pandemic. Even before the pandemic, Ms. Talplacido

23   served many constituents in the criminal justice system as contact for the Court, the U.S.

24   Attorney's Office, the District's defense attorneys, and the Federal Defenders alike. (Tr. 1

25   at 57:11–25, 58:1–5.) As a result, she often communicated directly with defense counsel

26   and inmates at MCC regarding a broad number of matters, including "legal calls, mail,

27   funds, [and] visits." (Tr. 1 at 58:12–17.) Thus, when the pandemic hit, it is unsurprising

28

1    that Ms. Talplacido became primarily responsible for ensuring that inmates could

2    continue to communicate with counsel. In this role, she continued to communicate

3    defense counsel, attempted to schedule legal calls, managed the SDC Visiting email

4    address, drafted the call policy preceding the unmonitored phones, and coordinated and

5    trained other MCC staff on the relevant processes. (*See generally* Tr. 1.) Given the

6    breadth and importance of her role, it is not suspicious that Ms. Talplacido felt it was

7    "very proper" to check-in with Mr. Kemmerer on April 8, 2020 regarding his counsel's

8    outstanding requests to schedule a legal call. (Tr. 1 at 102:4–19.)

9         With this background in mind, the Court credits Ms. Talplacido's testimony and

10   observes that much of it helps explain why her conduct was not unethical. As to the April

11   7, 2020 email from AUSA Askins, Mr. Talplacido credibly testified that she did not read

12   the email before speaking to Mr. Kemmerer. (Tr.1 at 126:15–17.) Mr. Kemmerer's

13   arguments notwithstanding, the Court is persuaded that this conduct is reasonable given

14   Ms. Talplacido's forthright demeanor at the hearing. The Court finds that given her

15   standard 6 a.m. to 2 p.m. work schedule, it is credible that she was asleep or unlikely to

16   check her phone when the email came in at 8:03 p.m. on April 7, 2020. (Tr. 1 at 149:17–

17   25, 150:1–6.) Likewise, given her practice of single-handedly reviewing, printing, and

18   organizing all call requests from defense counsel upon coming into work, it is possible

19   she did not check her BOP email address before speaking with Mr. Kemmerer on the

20   morning of April 8, 2020, and instead checked it around 9:00 a.m. or 9:30 a.m. after

21   distributing the call sheets.[9] (Tr. 1 at 85:12–17, 150:7–16.)

---

24   [9] Mr. Kemmerer filed an untimely request to supplement the hearing exhibits with about one dozen
25   additional emails between defense counsel and Ms. Talplacido's BOP email address showing that she
     responded to defense counsel's requests from that email address on numerous occasions between 6:21
26   a.m. and 7:46 a.m. (ECF No. 84.) The Government responds that these emails should not be accepted
     into the record, (ECF No. 85). Neither Party offers any authority to explain whether this is proper or
27   improper. Consequently, given the seriousness of Defendant's allegations here and the obvious
     relevance of these emails, the Court exercises its authority to accept ECF No. 84 and its attachments into

28                                                 25

1    The facts do not support an inference that Ms. Talplacido spoke to Mr. Kemmerer

2 to assist the Government's prosecution in order to defeat his motion to dismiss. Nor do

3 they demonstrate that Ms. Talplacido knowingly communicated directly or indirectly

4 with Mr. Kemmerer about the subject of his representation. Ms. Talplacido testified that

5 she did not speak to anyone from the U.S. Attorney's office before speaking to Mr.

6 Kemmerer or drafting her response to AUSA Askins's email request for documents. (Tr.

7 1 at 109:2–16, 111:4–20.) She also testified that no one from the U.S. Attorney's office

8 asked Ms. Talplacido to speak with Mr. Kemmerer and that she alone decided to

9 approach Mr. Kemmerer. (Tr. 1 at 108:18–25, 109:17–19.) Ms. Talplacido, moreover,

10 was unaware that Mr. Kemmerer was litigating an access to counsel issue in his case

11 when she spoke with him. (Tr. 1 at 16:19–25, 127:1–19.) And, she did not ask Mr.

12 Kemmerer about the facts of his underlying case or the substance of his communications

13 with counsel. (*Id.* at 152:6–12.)

14    Instead, it appears that this incident resulted from Ms. Talplacido's efforts to assist

15 the inmates at the MCC. Ms. Talplacido testified that she was not certain whether Mr.

16 Kemmerer had access to the unmonitored phone or his counselor's phone. (Tr. 1 at

17 93:13–24.) So, Ms. Talplacido consciously prioritized Mr. Kemmerer's call requests on

18 morning of August 8, 2020 because she wanted to make sure he had a chance to speak to

19 counsel. (*Id.* at 94:2–20.) After learning from Mr. Kemmerer that he had in fact spoken to

20 counsel and no longer needed a phone call, she asked him to write down what he told her

21

22

23    the record. Despite the Government's arguments as to the weight of these emails, (ECF No. 85 at 4–5),

24 they plainly undercut Ms. Talplacido's testimony, especially as two of the emails were sent at 6:33 a.m.

25 on April 9, 2020 and 7:11 a.m. on April 10, 2020. (ECF No. 84.) Nonetheless, because none of the
     emails were sent on the morning of April 8, 2020, the Court credits Ms. Talplacido's assertion that she

26 did not review AUSA Askins's April 7, 2020 email before speaking with Mr. Kemmerer. Afterall, Ms.
     Talplacido did not testify that she *never* sent emails in the mornings, just that she "prepare[d] the legal

27 calls to be made at the institution every day" first thing and that she "[t]ypically" checked her BOP
     email address afterward "at 9:00 or 9:30 a.m." (Tr. 1 at 150:7–16.).

28

1    so that she could relay that information to the unit secretary, confirm Mr. Kemmerer no

2    longer needed a scheduled call, and note his contact in the MCC's logbook.[10] (*Id.* at

3    96:10–24.) Given that this process was "all new," and the MCC's existing policy of

4    tracking attorney contacts prior to COVID-19, Ms. Talplacido's conduct is

5    understandable. (*Id.* at 79:17–20, 102:10–19.) The Court's review of the video of Ms.

6    Talplacido's brief interaction with Mr. Kemmerer on April 8, 2020, and her narrative

7    testimony of their conversation, reveals nothing untoward in their exchange. (Tr. 1 at 98–

8    106; Gov't Ex. 10.)

9           Lastly, neither the declarations nor the other inmates' statements compel a

10   different conclusion. The Court does not find it suspicious that Ms. Talplacido failed to

11   note she did not review AUSA Askins's email in her declaration because, from her

12   perspective, that may not have been relevant. (Tr. 1 at 144:18 (noting that she was "very

13   specifically" answering "how, why, and when" her contact with Mr. Kemmerer took

14   place).) In addition, Mr. Sagale testified that the notes he took in preparing to make a

15   declaration, i.e., the missing "memo," were fully incorporated into the declaration. (Tr. 2

16   at 11:13–15.) However, Ms. Talplacido assisted Mr. Sagale in preparing a declaration

17   that included facts to which he did not have personal knowledge. That is concerning but

18   does not fatally undermine her other testimony, because it appears that Mr. Sagale "was

19   comfortable with what [he] signed off on that day." (Tr. 2 at 10:23-24.)

20          Accordingly, the Court finds Ms. Talplacido did not intentionally interfere with

21   Mr. Kemmerer's attorney-client relationship or try to assist the Government in its case

22   against him by obtaining a statement from him regarding his contacts with counsel.

23   Rather, as Government counsel noted at the hearing, Ms. Talplacido was "just trying to

---

[10] The Court observes some ambiguity or inconsistency as to Ms. Talplacido's statements regarding what she told him. It is not clear exactly how prescriptive she was in asking him to make a statement. Nonetheless, the Court finds that this is insufficient to render her testimony incredible.

do her job," and a difficult one, under unique circumstances, at that. Consequently, the Court concludes Ms. Talplacido did not violate Rule 4.2.

In addition, the Court also finds that the Prosecutors in this matter did not indirectly violate Rule 4.2 by relying on the statement Mr. Kemmerer provided to Ms. Talplacido, as the statement was not obtained in violation of Rule 4.2 and the Prosecutors did not direct Ms. Talplacido's conduct. *See Torres v. Wells Fargo Bank*, No. CV-17-9305-DMG, 2019 WL 8012686, at \*5 (C.D. Cal. Dec. 17, 2019) (declining to find that plaintiff's counsel directed his client to attempt to convince two of defendant's employees to sign declarations counsel had drafted before their depositions in violation of Rule 4.2).

While the Court finds there was no violation of Rule 4.2, it would have been more prudent for the Government to refrain from relying on Mr. Kemmerer's uncounseled statement. That restraint is particularly important here given Ms. Talplacido's unique role in this District, the need for MCC inmates to feel free in communicating with Ms. Talplacido regarding the services she provides, and the trust that defense counsel place in Ms. Talplacido to facilitate attorney-client communication in the MCC, especially during the ongoing pandemic. The Court, moreover, is mindful that the Government's contact with unrepresented defendants, even where permissible, is fraught with complications and the potential for ethical violations. Thus, to encourage the ongoing communications between MCC counsel and inmates that are required in accommodating defense counsels' requests for communications with their clients, the Court will exercise its supervisory powers and will decline to consider the April 8, 2020 Kemmerer note in adjudicating the original motion to dismiss Indictment based upon the denial of "free, confidential, no-contact communications."

### b.  No Violation of the Sixth Amendment

For much of the same reasoning, the Court also finds that Mr. Kemmerer has not met his burden in showing that Ms. Talplacido or the Prosecutors in this matter

"deliberately interfere[d] with [Mr. Kemmerer's] confidential relationship" with counsel. *Williams*, 384 F.3d at 584–85. The Court has concluded that Ms. Talplacido did not intend to assist the Government in defeating Mr. Kemmerer's instant motion by speaking with him. Rather, Ms. Talplacido was attempting to implement a new communications system during the COVID-19 pandemic to assist inmates in communicating with counsel while complying with Bureau of Prison's policies.

To the extent that Ms. Talplacido's conduct was nonetheless "deliberate" because she intended to speak with Mr. Kemmerer, and even recognizing that her contact resulted in an uncounseled statement upon which the Government then relied, the Court nonetheless finds that Mr. Kemmerer has not shown "substantial prejudice" as to his defense. First, Mr. Kemmerer's note does not support an inference that he was able to speak with counsel confidentially prior to his release from the MCC; only that, as of April 8, 2020, he had spoken with counsel "frequently" and at least once on April 7, 2020. (Gov't Ex. 9.) That is consistent with Counsel's declarations to the Court, and thus is not the basis of the Court's denial of Mr. Kemmerer's instant motion. (*See* ECF No. 41-1 (noting that counsel spoke "with Mr. Kemmerer on the phone several times" and explaining that these conversations were not "confidential")). In other words, Ms. Talplacido's conduct has not prejudiced Mr. Kemmerer with respect to his pre-trial motions.

In addition, Mr. Kemmerer fails to show any concrete consequences to his prosecution resulting from Ms. Talplacido's conduct. There is no allegation that the Government obtained evidence through this incident that would give the prosecution "any unfair advantage" at trial. *See Abundis v. Fakhoury*, No. CV-12-00450-ODW, 2012 WL 6801346, at *17 (C.D. Cal. Nov. 16, 2012), (concluding that defendant was not prejudiced by a recording of a conversation with a prior attorney discussing preliminary trial strategy two years before trial because he could not identify "confidential matters that were later utilized by the prosecution" at trial or "any evidence was admitted based

3:19-CR-02513-GPC

1    on the recording"). There is also no allegation that Ms. Talplacido obtained and

2    communicated to the Prosecutors "privileged trial strategy information." *See United*

3    *States v. Danielson*, 325 F.3d 1054, 1069 (9th Cir. 2003), *as amended* (May 19, 2003).

4         Thus, because Ms. Talplacido's contact with Mr. Kemmerer was not unethical, the

5    specific facts of this case do not support a finding of "substantial prejudice" as required

6    to establish a Sixth Amendment violation. *Williams*, 384 F.3d at 584–85. The Court

7    emphasizes in reaching this conclusion that it is a fact-specific one.

8         **c. Remedy**

9         The Ninth Circuit has "recognized that [the court's] exercise of supervisory powers

10   is an appropriate means of policing ethical misconduct by prosecutors." *United States v.*

11   *Lopez*, 4 F.3d 1455, 1463 (9th Cir. 1993); *see also United States v. McClintock*, 748 F.2d

12   1278, 1286 (9th Cir. 1984). Moreover, the Court has broad supervisory powers, including

13   to "(1) to implement a remedy for a violation of recognized rights; (2) to preserve judicial

14   integrity by ensuring that a criminal conviction rests on appropriate considerations

15   validly before the jury; and (3) to deter future illegal conduct." *United States v. W.R.*

16   *Grace*, 526 F.3d 499, 511 n.9 (9th Cir. 2008) (en banc) (quotation omitted.)

17        Mr. Kemmerer urges the Court to dismiss the Indictment against Mr. Kemmerer

18   for Ms. Talplacido's perceived misconduct and the Prosecutors' use of its fruits. (ECF

19   No. 41 at 9–10.) However, having concluded that Ms. Talplacido did not violate Rule 4.2,

20   and in declining to find that the Prosecutors are separately at fault, the Court finds that no

21   government conduct "so grossly shocking and so outrageous" as to merit dismissal.

22   *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (quotation omitted). Nor are

23   there grounds for the Court to exercise its supervisory powers and order the extreme

24   remedy of dismissal to deter future illegal conduct or protect against the appearance of

25   impropriety. *Cf. United States v. Lopez*, 4 F.3d 1455, 1464 (9th Cir. 1993) (noting that,

26   even where the Government acts unethically, it may be imprudent to "remedy[] that

27   misconduct through dismissal of a valid indictment" and that, "when there is no showing

28

                                          30

of substantial prejudice to the defendant, lesser sanctions, such as holding the prosecutor in contempt or referral to the state bar for disciplinary proceedings, can be adequate to discipline and punish government attorneys who attempt to circumvent the standards of their profession."). Thus, the Court denies Mr. Kemmerer's request for dismissal.

## VI.   Conclusion

For the foregoing reasons, the Court finds that the MCC phone call policy adopted in response to COVID-19 and the Bureau of Prison's policy of suspending in-person legal visits does not establish a Sixth Amendment violation over the six weeks that Mr. Kemmerer was subjected to it. In addition, the Court finds that Ms. Talplacido did not act unethically and thus there is no basis here for concluding that the Prosecutors indirectly violated California Rule of Professional Conduct 4.2 or Mr. Kemmerer's Sixth Amendment rights. Consequently, the Court **DENIES** Mr. Kemmerer's motions and finds that dismissal is not appropriate.

**IT IS SO ORDERED.**

Dated: August 13, 2020

Hon. Gonzalo P. Curiel
United States District Judge