1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          SOUTHERN DISTRICT OF CALIFORNIA
10
11   UNITED STATES OF AMERICA,                Case No.: 3:19-CR-02513-GPC
                              Plaintiff,
12                                            **ORDER DENYING MOTION TO
13   v.                                       SUPPRESS STATEMENTS.**
14   BRANDON KEMMERER,
                              Defendant.       **(ECF Nos. 22, 24, 25, 26, 30, 34, 38, 39,
15                                            64, 65, 68, 71, 82.)**
16

17        Before the Court is Defendant's Motion to Suppress Statements for an unnecessary
18   delay in presentment under Federal Rule of Criminal Procedure ("FRCP") 5 and 18
19   U.S.C. § 3501(c). As a threshold matter, the Court finds that § 3501(c) applies to Mr.
20   Kemmerer's statements and that his valid *Miranda* waiver does not foreclose a challenge
21   to the statements under § 3501(c). Then, applying the two-step framework for § 3501(c)
22   outlined by the Supreme Court in *Corley v. United States*, 556 U.S. 315, 320 (2009), the
23   Court concludes that Special Agent Hutchinson interviewed Mr. Kemmerer within the
24   statute's six-hour safe harbor period and that Kemmerer's statement was voluntary.
25        Consequently, the Court **DENIES** Mr. Kemmerer's motion to suppress statements
26   made to Agent Hutchinson during the June 7, 2019 interview.
27   / / /
28                                           1

# I.   Background

## A. Procedural History

On November 13, 2019, Mr. Kemmerer filed a motion to suppress post-arrest statements made during his detention from Friday, June 7, 2019 to Monday, June 10, 2019. (ECF No. 22.) On December 13, 2019, the Government filed a response. (ECF No. 24.) On December 20, 2019, the Court then held its first hearing on the motion to suppress. (ECF No. 25.) The Court continued the hearing and granted Defendant leave to filed a reply. (Id.)

On January 12, 2020, Mr. Kemmerer filed a reply. (ECF No. 26.) Then, on January 15, 2020, the Court held a second hearing on Defendant's motion. (ECF No. 30.) Given the Parties' arguments, the Court again continued the matter and permitted the Parties to submit additional briefing. (*Id.*) On January 24, 2020, the Government filed supplemental briefing. (ECF No. 31.) On January 31, 2020, Mr. Kemmerer filed a response. (ECF No. 34.) The Court ordered Mr. Kemmerer to file a sur-response, which he then filed on February 20, 2020. (ECF No. 38.) The Court held a hearing the next day. (ECF No. 39.)

On May 6, 2020, the Court held a status conference and ordered an evidentiary hearing as to Mr. Kemmerer's motion to suppress. (ECF No. 60.) On June 2, 2020, the Government filed a supplemental brief. (ECF No. 64.) On June 4, 2020, Mr. Kemmerer filed two additional briefs. (ECF No. 65, 68.) Then, on June 12, 2020, the Government filed an additional brief. (ECF No. 71.) An evidentiary hearing was held on June 18 and 19, 2020, during which Special Agent Jonathan D. Hutchinson testified as to the motion to suppress on the first day. (ECF Nos. 82, 83.)

## B. Mr. Kemmerer's Arrest

At approximately 9:30 a.m. on June 7, 2019 at the San Ysidro, California Port of Entry ("POE"), United States Customs and Border Protection ("CBP") Officer Orlando Perez's narcotics dog "alert[ed]" to the rear driver side door of a car driven by Defendant Brandon Kemmerer. (ECF No. 24-1, Declaration of Special Agent Jonathan D.

2

Hutchinson ("Hutchinson Decl.") at ¶ 2; ECF No. 22-1 at 2, Ex. A, Perez Report of Investigation ("Perez ROI").)

Officer Perez instructed Mr. Kemmerer to put the car in park, turn it off, and open the trunk. (Perez ROI.) Mr. Kemmerer complied. Officer Perez inspected the passenger side quarter panel of the car and discovered several packages. (Hutchinson Decl. at ¶ 2; ECF No. 26-1, Ex. A, Declaration of Defendant Brandon Kemmerer ("Kemmerer Decl.") at ¶ 2.) Officer Perez then instructed Mr. Kemmerer to stay in the car. (Perez ROI.) Defendant again complied, stating "Oh, OK thank you." (*Id.*) Officer Perez called over a second officer, CBP Officer Justine Burnett. (Hutchinson Decl. at ¶ 2.) Officer Burnett spoke with Officer Perez, inspected the car, and also saw the cellophane wrapped packages. (Hutchinson Decl. at ¶ 3; Perez ROI; ECF No. 22-1 at 4, Ex. B, Burnett Report of Investigation ("Burnett ROI").) The officers then ordered Defendant to get out of his car. (Hutchinson Decl. at ¶ 3.) Officer Burnett handcuffed Mr. Kemmerer and escorted him to the security office. (*Id.*; Kemmerer Decl. at ¶ 3.) There, Officer Burnett removed the handcuffs, patted Mr. Kemmerer down, and took his personal belongings. (Hutchinson Decl. at ¶ 3; Kemmerer Decl. at ¶¶ 6–7; Burnett ROI.)

By 9:41 a.m., Officer Burnett secured Mr. Kemmerer to a bench in the security office with a leg shackle. (Kemmerer Decl. at ¶ 8; Hutchinson Decl. at ¶ 3.) It is "standard CBP pattern and practice . . . to detain individuals on a bench in the main Security Office area with one leg secured to the bench using an ankle chain." (Hutchinson Decl. at ¶ 4.) Officer Burnett did not tell Mr. Kemmerer that he was under arrest. (Hutchinson Decl. at ¶ 3; Kemmerer Decl. at ¶ 5.) Officer Burnett also "never told [Mr. Kemmerer] . . . that he was detain[ed] for officer safety." (Kemmerer Decl. at ¶ 5.) Officer Burnett "had no further contact with [Mr. Kemmerer]." (Burnett ROI.)

Defendant remained "shackled to the bench for what seemed like hours." (Kemmerer Decl. at ¶ 9.) "While shackled to the bench, [Defendant] could not freely use

the restroom and did not have access to drinking water."[1] (*Id.* at ¶ 10.) While Defendant was in custody, CBP Officer Abram Lopez examined images of Defendant's car on the Z-portal x-ray machine and noticed several anomalies. (Hutchinson Decl. at ¶ 5.)

At approximately 10:15 a.m., CBP Officer David Davis inspected the vehicle itself. (Hutchinson Decl. at ¶ 6.) Ten minutes later, Davis went to the security office and "obtained Kemmerer's biographical information." (*Id.*) Davis then returned to the lot and drove the car to the processing area. (*Id.*) There, Davis removed one package from the rear passenger side quarter panel and another officer tested its contents. (*Id.* at ¶ 7.) The contents tested positive for methamphetamine. (*Id.*) At about 10:40 a.m., Davis contacted "Apple Enterprises to potentially remove the fuel tank" from the car. (*Id.*)

Officer Davis then returned to the security office and "formally placed Kemmerer under arrest."  (*Id.* at ¶ 8.) Davis could not remember "at exactly what time" he did so. (*Id.*) According to the "CBP computer system, officials with CBP entered an arrest time for Kemmerer of approximately 11:12 a.m. on June 7, 2019." (*Id.* at ¶ 9.) Once under arrest, an officer "moved [Defendant] to a detention cell." (ECF No. 31 at 12.) Defendant's shackles were thus removed no later than 11:12 a.m. [2]

---

[1] The Court understands Defendant's declaration to mean that he could not get up of his own volition to get water or use the bathroom. The Government recognized as much. (ECF No. 30 at 10 ("Certainly we are not saying that [Defendant] was free to get up at will and move around.")) There is no specific allegation that an officer denied any request to use the bathroom, drink water, or place a phone call.

[2] It is not clear when Defendant's shackles were removed. The Parties agree that he was brought into the security room and shackled shortly after being stopped at the border. (*Compare* ECF No. 22 at 2–3 (asserting that the officers inspected Defendant's car at about 9:30 a.m. and then escorted him to the security office) *with* ECF No. 24 at 3 ("At approximately 9:41 a.m., Officer Burnett arrived in the security office with Defendant . . . [and secured] Defendant in the Security Office.") The Government further proffers without dispute by Defendant that the officers "moved [Defendant] to a detention cell" once he was arrested. (ECF No.  31 at 12.) Consequently, the Court finds that Defendant was shackled by 9:41 a.m. and that the shackles were removed no later than 11:12 a.m.

4

### C. Agent Hutchinson's Investigative Conduct

At approximately 11:47 a.m., Agent Hutchinson was notified that a narcotics load was found concealed in a vehicle at the San Ysidro POE. (ECF No. 82, Transcript of June 19, 2020 Evidentiary Hearing ("Tr. 1") at 16:1.) Agent Hutchinson was one of three[3] duty agents "on call to accept new drug-smuggling cases or other cases . . . at the ports of entry" in San Ysidro, Otay Mesa, and Tecate at that time. (Tr. 1 at 14:23–25, 15:1–3.) Agent Hutchinson understood the time of arrest to be 11:12 a.m. (*Id.* at 18:14–15.)

At the time, Agent Hutchinson was conducting an interview at the Otay Mesa Port of Entry. (Tr. 1 at 18:19–21.) The interview finished at 12:05 p.m. (*Id.* at 19:4–5.) Agent Hutchinson then processed the case, which typically requires completing the U.S. Attorney's Office intake form, the defendant locator intake form, the prisoner remand form, the subject's rap sheet, and the criminal complaint. (*Id.* at 19:9–25, 20:1–11.) Agent Hutchinson estimates that he finished processing the Otay Mesa case by 2:28 p.m. because, at that time, he texted another Agent that he was "on [his] way to San Ysidro." (*Id.* at 21:16–25, 22:7–12.)

Agent Hutchinson arrived at San Ysidro POE by 2:48 p.m. (Tr. 1 at 18:24–25.) Upon arriving for a duty call, it is Agent Hutchinson's "practice" to conduct a one to two-hour preliminary investigation "prior to starting the interview" of the subject in custody. (*Id.* at 27:5–14.) Agent Hutchinson testified that this investigation includes conducting "initial records checks" about the subject at the HSI office,[4] speaking to the seizure officers, inspecting the seized vehicle and contraband, documenting any items retrieved

---

[3] Approximately three additional duty agents were available as "floaters" to assist with investigations. (Tr. 1 at 16:12–24.)

[4] Agent Hutchinson explained that such checks might include, for example, a criminal history check, a check of the subject's border crossing history, a check of the vehicle's border crossing history, open-source database checks, checks in the Department of State systems, and other associated checks (i.e., checks on co-passengers, people associated with the subject, or people associated with the vehicle). (Tr. 1 at ¶ 22:23–25, 23:1–13.)

from the vehicle, photocopying any seized documents or relevant reports produced by the officers at the POE, checking-in at the security office, and finally conducting any additional checks regarding the information learned in the preliminary investigation. (*Id.* at 22–26.) Agent Hutchinson testified that these "investigative steps are very important because they build a foundation of information regarding the incident, [] subject, [and] vehicle" that are "very useful when determining the truthfulness of a subject during the interview." (*Id.* at 27:18–22.) Agent Hutchinson also testified that many of these investigative steps – including reviewing a defendant's criminal history, checking his border crossing pattern, or photographing relevant documents and items – were not necessary to filling a complaint or charging a defendant. (*Id.* at 41:14–25, 42:1–20.)

Agent Hutchinson reviewed six items that were taken from the vehicle, including a passport, as well as "some vehicle documents" and a receipt. (Tr. 1 at 25:13–15.) He first encountered Mr. Kemmerer during the investigation when he stopped by the holding cell to determine if Mr. Kemmerer needed an interpreter. (*Id.* at 28:2–13.) After completing the investigation, Agent Hutchinson asked a CBP officer to join him for the interview and then escorted Mr. Kemmerer from his holding cell to an office. (*Id.* at 27:1–4, 28:14–18.)

### D. Mr. Kemmerer's Custodial Interview

Agent Hutchinson began interviewing Mr. Kemmerer at approximately 3:46 p.m. by completing a biographical form with the Defendant. (Tr. 1 at 29:1–9.) Ten minutes into the interview, at "3:56 p.m., approximately," Agent Hutchinson read from the *Miranda* form and explained to Mr. Kemmerer the rights he was waiving by participating in the interview. (*Id.* at 29:12–19, 50:1–3.) Mr. Kemmerer read the form, initialed each line, and affixed his signature next to those of Agent Hutchison and a CBP officer. (*Id.* at 29:20–23, 31:1–6.)

During the Court of the interview, Mr. Kemmerer repeatedly denied knowledge of the methamphetamines hidden in the car and explained that a neighbor had access to the car. (Gov't Hrg. Ex. 13, DVD of Interview.) Mr. Kemmerer also discussed his

1   relationship to the car, border crossing history, conduct in the days preceding his arrest,

2   and communications with other people who had access to the car. (*Id.*) The Agent,

3   moreover, indicated that several of Mr. Kemmerer's statements seemed suspicious or

4   deceitful, including his denial of knowledge, failure to bring up a prior arrest, and certain

5   details as to his recent use of the car. (*Id.*)

6        In describing Mr. Kemmerer's demeanor at the interview, Agent Hutchinson stated

7   that he "seemed normal to me, cordial, didn't seem to be under any duress, any

8   nervousness. He seemed perfectly fine." (Tr. 1 at 33:1–3.) Mr. Kemmerer did not seem

9   "ill" or "impaired," and Mr. Kemmerer did not request to take a break for any reason or

10   indicate that he needed medication. (*Id.* at 34–35.) Responding to a question from the

11   Court, Agent Hutchinson observed that Mr. Kemmerer maintained the same appearance

12   during most of the interview and only acted "a little skittish" when the Agent raised the

13   possibility that he was "not being truthful." (*Id.* at 33:9–18.) Towards the end of the

14   interview, Mr. Kemmerer remarked that he felt "intimidated." (Gov't Hrg. Ex. 13.)

15   Ultimately, the interview lasted about one hour and concluded around 4:52 p.m. (*Id.* at

16   33:5–6; Hutchinson Decl. at ¶ 10.)

17        After the interview, Agent Hutchinson first contacted the MCC to obtain a booking

18   window for Mr. Kemmerer. (Tr. 1 at 51:1–7; Hutchinson Decl. at ¶ 13.) Agent

19   Hutchinson also contacted the U.S. Attorney's Office to submit a referral package

20   regarding Mr. Kemmerer. (Tr. 1 at 51:9–13.) On June 10, 2019, Defendant was presented

21   to Magistrate Judge Andrew G. Schopler. (Hutchinson Decl. at ¶ 14.) Assuming

22   Defendant's initial appearance occurred at 11 a.m., Defendant was held 73.5 hours, or

23   about three days, before his initial presentment. There is no allegation Mr. Kemmerer

24   gave any statements to law enforcement following his interview with Agent Hutchinson.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.  **Legal Standard**

### A. *Miranda*

Before proceeding with a custodial interrogation, a suspect must be advised of his *Miranda* rights: that he "'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). The police are required to explain these rights to a suspect "before questioning begins," *Davis v. United States*, 512 U.S. 452, 457 (1994), and, if a defendant requests counsel, "the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). Statements obtained in violation of *Miranda* generally are inadmissible in the Government's case-in-chief. *New York v. Harris*, 495 U.S. 14, 20 (1990).

A suspect's waiver of these rights is valid only if it is "voluntary, knowing and intelligent." *Miranda*, 384 U.S. at 479. Thus, the waiver inquiry "has two distinct dimensions." *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (quotation omitted). First, it must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

A waiver satisfies this two-part standard only "if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation omitted). Among other circumstances, a court may consider "(i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly

1  explained to him; and (vi) whether the defendant had prior experience with the criminal

2  justice system." *United States v. Price*, 921 F.3d 777, 792 (9th Cir. 2019) (quoting *United*

3  *States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007)).

4      **B. 18 U.S.C. § 3501(c)**

5      The right to prompt presentment is found in Rule 5(a), which provides that "[a]

6  person making an arrest within the United States must take the defendant without

7  unnecessary delay before a magistrate judge." FED. R. CRIM P. 5(a)(1)(A). 18 U.S.C. §

8  3501(c), in turn, governs whether a defendant's confession may be admissible where the

9  Government violates Rule 5(a).[5] Section 3501(c) codifies the *McNabb–Mallory* Rule,

10  which rendered a confession inadmissible if it was obtained during an unreasonably long

11  period of detention between a defendant's arrest and initial court appearance. *See*

12  *generally Mallory v. United States*, 354 U.S. 449, 450–51 (1957) (confession obtained

13  around 9:30 p.m. following defendant's arrest "between two and two-thirty p.m.");

14  *McNabb v. United States*, 318 U.S. 332 (1943).

15      A district court hearing a presentment challenge must engage in a two-step inquiry

16  under to § 3501(c). First, the court "must find whether the defendant confessed within six

17  hours of arrest." *Corley v. United States*, 556 U.S. 315, 320 (2009) (quotations omitted).

18  "If the confession came within [the safe harbor] period, it is admissible, subject to the

19

20

21     [5] This provision states in full: "In any criminal prosecution by the United States or by the District of

22  Columbia, a confession made or given by a person who is a defendant therein, while such person was

23  under arrest or other detention in the custody of any law-enforcement officer or law-enforcement

   agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate

   judge or other officer empowered to commit persons charged with offenses against the laws of the

24  United States or of the District of Columbia if such confession is found by the trial judge to have been

   made voluntarily and if the weight to be given the confession is left to the jury and if such confession

25  was made or given by such person within six hours immediately following his arrest or other detention:

   Provided, That the time limitation contained in this subsection shall not apply in any case in which the

26  delay in bringing such person before such magistrate judge or other officer beyond such six-hour period

   is found by the trial judge to be reasonable considering the means of transportation and the distance to

27  be traveled to the nearest available such magistrate judge or other officer." 18 U.S.C. § 3501(c).

28

1    other Rules of Evidence, so long as it was made voluntarily and . . . the weight to be

2    given it is left to the jury." *Id.* (quotations omitted); *United States v. Redlightning*, 624

3    F.3d 1090, 1108 (9th Cir. 2010) (referring to the six-hour period as a "safe harbor"). The

4    safe harbor period under § 3501(c) begins with a defendant's arrest.[6] *See United States v.*

5    *Garcia-Hernandez*, 569 F.3d 1100, 1105 (9th Cir. 2009).

6        An arrest occurs at the point when "a reasonable person would have believed that

7    he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). That

8    "depends upon the objective circumstances of the situation," *United States v. Bravo*, 295

9    F.3d 1002, 1009 (9th Cir. 2002), including "the extent to which liberty of movement is

10   curtailed and the type of force or authority employed." *United States v. Robertson*, 833

11   F.2d 777, 780 (9th Cir. 1987). Handcuffing is one "substantial" factor militating in favor

12   of finding an arrest, *Bravo*, 295 F.3d at 1010 (quoting *United States v. Juvenile (RRA–A)*,

13   229 F.3d 737, 743 (9th Cir. 2000)), though the use of handcuffs does not always convert

14   a detention into an arrest if necessary to ensure the officers' safety. *See United States v.*

15   *Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (finding that officers did "transform a *Terry*

16   stop into an arrest" by using handcuffs where a suspect "twice disobeyed" and made

17   "furtive movements").

18       The Government "has more latitude to detain persons in a border-crossing

19   context." *United States v. Doe*, 219 F.3d 1009, 1014 (9th Cir. 2000). The "power to

20   detain persons at the border . . . derives from the nation's right to regulate who and what

21   may enter the Country," *United States v. Ramsey*, 431 U.S. 606, 616 (1977), and this

22   national interest alters the "balance between the interests of the Government and the

---

25   [6] Section 3501(c) states that it applies to a person "under arrest or other detention." 18 U.S.C. § 3501(c).

26   The Ninth Circuit has recognized that "the term 'other detention' might have independent meaning from 'arrest' upon formal charges in an extraordinary situation." *United States v. Gowadia*, 760 F.3d 989, 995

27   (9th Cir. 2014). Here, the Court need not consider what precisely amounts to an extraordinary situation as the instant matter falls below that threshold.

28

privacy right of the individual" in favor of the government. *United States v. Montoya de Hernandez*, 473 U.S. 531, 539–40 (1985). Thus, the standard for determining whether a person is under arrest at a Port of Entry is whether a reasonable person would believe that he is being subjected to more than the "temporary detention occasioned by border crossing formalities." *United States v. Hernandez*, 322 F.3d 592, 596–97 (9th Cir. 2003) (quotation omitted). Nonetheless, such searches and detentions must be "conducted promptly." *United States v. Espericueta Reyes*, 631 F.2d 616, 622 (9th Cir. 1980).

The Court must then assess the reasonableness of any delay to presentment beyond six hours. *Corley*, 556 U.S. at 320 (if "the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the McNabb–Mallory cases, and if it was, the confession is to be suppressed.") A "delay for the purpose of interrogation is the epitome of 'unnecessary delay.'" *Corley*, 556 U.S. at 308 (citing *Mallory*, 354 U.S. at 455–56). That is because the *McNabb–Mallory* Rule functions "to deter police from engaging in lengthy prearraignment detentions for the purpose of further interrogating a defendant." *United States v. Garcia-Hernandez*, 569 F.3d 1100, 1106 (9th Cir. 2009). And, local agency rules and court rules governing initial appearances must also accommodate § 3501(c) to ensure prompt presentment. *United States v. Valenzuela-Espinoza*, 697 F.3d 742, 750–51 (9th Cir. 2012) (finding a 10:30 a.m. filing requirement for same-day arraignments did not justify a presentment delay).

On the other hand, the Ninth Circuit has "'identified three categories of reasonable delays apart from transportation, distance, and the availability of a magistrate': (1) delays for 'humanitarian reasons;' (2) 'delays due to the unavailability of government personnel [and judges] necessary to completing the arraignment process;' and (3) 'delays necessary to determine whether a suspect should be criminally charged.'" *United States v. Pimental*, 755 F.3d 1095, 1101 (9th Cir. 2014) (quoting *Valenzuela–Espinoza*, 697 F.3d at 752) (internal quotation marks and alteration omitted). In addition, § 3501(c) expressly permits

1   a delay occasioned by "the means of transportation and the distance to be traveled to the

2   nearest available" magistrate. 18 U.S.C. § 3501(c). And, courts also consider "the public

3   policy concerns" created by delaying a defendant's presentation to the magistrate judge,

4   *see United States v. Djordjevic*, 631 F. App'x 463, 464 (9th Cir. 2015), including

5   "discouraging officers from unnecessarily delaying arraignments, preventing admission

6   of involuntary confessions, and encouraging early processing of defendants." *Van Poyck*,

7   77 F.3d at 289 (citing *United States v. Wilson*, 838 F.2d 1081, 1087 (9th Cir. 1988)).

8   **III.   Discussion**

9       **A. Definition of "Confession" Under § 3501**

10       As a threshold matter, the Government asks the Court to find that § 3501(c) does

11   not apply to Agent Hutchinson's interview with Mr. Kemmerer because Mr. Kemmerer's

12   responses are effectively exculpatory in reliance on *United States v. Gonzales*, 749 F.2d

13   1329, 1335 (9th Cir. 1984). (ECF No. 64 at 8–9 (explaining that "Defendant denied

14   knowledge (and indeed, even any suspicion) of the narcotics in his vehicle").) Mr.

15   Kemmerer argues that his statements are not exculpatory, and that *Gonzales* is no longer

16   good law. (ECF No. 65.) The Court finds that 18 U.S.C. § 3501(c) applies.

17       Section 3501(c) restricts the admissibility of a criminal defendant's "confession"

18   for undue delay in certain circumstances. 18 U.S.C. § 3501(c). The statute defines the

19   term "confession" to include "any confession of guilt of any criminal offense or any self-

20   incriminating statement made or given orally or in writing." 18 U.S.C. § 3501(e).

21   Statements that are "self-incriminating" include, for example, a defendant's admission

22   that he "committed any act which would constitute an element of the crime," *United*

23   *States v. Amador-Galvan*, 12 F.3d 1108 (9th Cir. 1993), or "factual admissions

24   connecting [the defendant] to" the crime. *United States v. Baker*, 888 F. Supp. 1521, 1526

25   (D. Haw. 1995). Section 3501(e) may also apply to statements are, in some sense,

26   exculpatory. *See United States v. Liera*, 585 F.3d 1237, 1240 (9th Cir. 2009); *but see*

27

28

1    *United States v. Gonzales*, 749 F.2d 1329, 1335 (9th Cir. 1984) (excluding "basically

2    *exculpatory*" statements) (emphasis in original).

3    The Ninth Circuit's decision in *Liera* is instructive. In *Liera*, CBP officers twice

4    interrogated defendant Liera, who was eventually charged with alien smuggling. *United*

5    *States v. Liera*, 585 F.3d 1237, 1240 (9th Cir. 2009). During the first interrogation, Liera

6    denied knowledge of the aliens, told the officer that the truck at issue belonged to

7    someone else, and said that he borrowed the truck to get to work. *Id.* During the second

8    interrogation, after an officer observed that "Liera's phone had received three calls from a

9    phone number stored . . . under the name 'Pollos,'" Liera "acknowledged that one

10   meaning for 'Pollos was 'smuggled aliens'" but "claimed that the 'Pollos' entry in his

11   cell phone referred to a friend of his who sold chickens." *Id.* In addressing a Rule 5

12   challenge, the Ninth Circuit held "that the district court clearly erred by refusing to

13   suppress statements Liera made during his second interrogation." *Id.* at 1244. The Ninth

14   Circuit, moreover, expressly referenced § 3501(e) when discussing Liera's "confession"

15   at the second interview, emphasizing that a confession includes "*any self incriminating*

16   *statement.*" *Id.* at 1242 n.5 (emphasis in original). Thus, the Ninth Circuit applied §

17   3501(e) to Liera's discussion of the "Pollos" calls, noting that the Government eventually

18   relied on the calls at trial. *Id.* at 1244.

19   Mr. Kemmerer's statements are likewise covered by § 3501(e). Mr. Kemmerer was

20   interviewed by Agent Hutchinson while in custody regarding the methamphetamine

21   discovered in his vehicle. (Gov't Hrg. Ex. 13, DVD of Interview.) Mr. Kemmerer

22   repeatedly denied knowledge of the methamphetamines and explained that a neighbor

23   had access to the car. (*Id.*) Mr. Kemmerer also discussed his relationship to the car,

24   border crossing history, conduct in the days preceding his arrest, and communications

25   with other people who had access to the car. (*Id.*) The Agent, moreover, indicated that

26   several of Mr. Kemmerer's statements were suspicious or deceitful, including his denial

27

28

of knowledge, failure to bring up a prior arrest, and certain details as to his recent use of the car. (*Id.*)

Mr. Kemmerer's detailed statements are self-incriminating within the meaning of § 3501(e) because they could be used to tie Mr. Kemmerer to the instant crime. *See United States v. Baker*, 888 F. Supp. 1521, 1526 (D. Haw. 1995) (applying § 3501 to an interview wherein defendant "generally denied being a pimp and taking money from prostitutes, but made some factual admissions connecting him to certain alleged prostitutes"). In addition, the fact that the Government expressly reserves the right to use Mr. Kemmerer's statements at trial, (ECF No. 64 at 8), underscores that "Defendant's statements *could be* considered self-incriminating in nature." *Baker*, 888 F. Supp. at 1532 (emphasis added); *see also Liera*, 585 F.3d at 1244 (observing that the subject statements were used by the prosecution at trial). Afterall, if "a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution." *See Miranda v. Arizona*, 384 U.S. 436, 476–77 (1966). And, contrary to the Government's assertions, borrowing from *Miranda* when interpreting the scope of § 3501(e) is reasonable because § 3501's legislative history indicates that the statute was enacted in response to *Miranda* and its concerns regarding incriminating statements made by defendants. *United States v. Richardson*, 238 F.3d 433 (9th Cir. 2000) (citing *United States v. Dickerson*, 120 S.Ct. 2326, 2332 (2000)).

To the extent that *Gonzales* requires otherwise, the Court agrees with Defendant that its holding has been overruled by *Liera*. In *Gonzales*, a defendant charged with bank robbery told the police that he gave an acquaintance "a ride to the vicinity of the robbed bank," that later the acquaintance "flagged [defendant] down for another ride," and that the acquaintance then "gave [defendant] the bait bills that the police found in his sock." *Gonzales*, 749 F.2d at 1332 (emphasis in original). The Ninth Circuit reasoned that these statements were "basically *exculpatory*" and thus did not fall within the ambit of § 3501(e). *Id.* That conclusion is incompatible with *Liera*'s application of § 3501(e) to

14

defendant Liera's discussion of the "Pollos" calls. In both cases the defendants' statements served only to distance themselves from the possession of evidence linking them to the crime. *Compare Liera*, 585 F.3d at 1240 (offering an explanation to suggest defendant was not guilty despite the "Pollos" calls in his cellphone log) *with Gonzales*, 749 F.2d at 1332 (offering an explanation to suggest defendant was not guilty despite his possession of the bait bills). Consequently, *Liera* creates an irreconcilable conflict with *Gonzales* and the Court will follow the more recent precedent. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (noting that in cases of "clear irreconcilability . . . district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled").

Thus, the Court finds that Mr. Kemmerer's interview with Agent Hutchinson falls within the scope of § 3501(c) pursuant to *Liera* and *Baker* because they may be "self-incriminating." 18 U.S.C. 3501(e).

### B. Waiver of Rule 5 Challenge

The Government further argues that Mr. Kemmerer waived any right to argue a Rule 5 violation in waiving his *Miranda* rights. Though Mr. Kemmerer's *Miranda* waiver was "voluntary, knowing and intelligent," the Court concludes that Mr. Kemmerer's *Miranda* waiver does not extend to Rule 5 protections.

### 1. Mr. Kemmerer's *Miranda* Waiver is Valid.

To address the Government's argument, the Court must find there is a valid *Miranda* waiver. Mr. Kemmerer contends that his *Miranda* waiver was involuntary because, by that time he spoke to Agent Hutchinson, he had been under arrest for over six hours, restrained to a bench, and unable to freely access water, the restroom, or a phone. (ECF No. 34 at 5; ECF No. 68 at 2.) The Government argues that Mr. Kemmerer's oral and written waivers are adequate and that he was in no way coerced while in custody. (ECF No. 71 at 2–8.) Here, the Government has established a valid waiver.

In reviewing the Parties' submissions, and the video of Mr. Kemmerer's interview with Agent Hutchinson, the Court first concludes that Mr. Kemmerer's *Miranda* waiver was made voluntarily. There is no evidence indicating that Mr. Kemmerer was particularly susceptible to coercion. The record, for example, does not suggest that he had any mental deficits, was intoxicated, or is a juvenile. *Cf. Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (relying on defendant's age and diminished mental acuity from sleep deprivation). Likewise, the record does not suggest that Agent Hutchinson made any effort to coerce Mr. Kemmerer through, for example, "threats or promises to [the Defendant] before he waived his rights." *United States v. Cha*, 765 F. App'x 254, 255 (9th Cir.), *cert. denied*, 140 S. Ct. 419, 205 L. Ed. 2d 240 (2019). There is also no allegation that Agent Hutchinson even attempted to question Mr. Kemmerer in a manner that might trick or confuse him so as to be "psychologically coercive." *See United States v. Preston*, 751 F.3d 1008, 1028 (9th Cir. 2014). Rather, as the Government notes, Mr. Kemmerer was responsive throughout the conversation and did not confess, *see United States v. Perez*, 538 Fed. App'x 818, 819 (9th Cir. 2013) (recognizing that whether "a suspect remains in control of his responses and consistently denies guilt is compelling evidence that his will was not overborne."), even if he felt somewhat nervous or "intimated" at being interviewed. (Gov't Hrg. Ex. 13.) Thus, though Mr. Kemmerer was held for six hours in custody, with a portion of that in handcuffs or an ankle chain, these facts alone do not support a finding that Mr. Kemmerer's *Miranda* waiver was involuntary. [7] *See Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (finding that the

---

[7] In addition to challenging the voluntariness of his *Miranda* waiver, (ECF No. 68 at 4), Mr. Kemmerer also asserts that his statements to Agent Hutchinson were involuntary within the meaning of § 3501(c). (ECF No. 68 at 1–3.) Though the Government contends that Mr. Kemmerer "conflat[es] his voluntariness challenge under 18 U.S.C. § 3501(c) with a claim that Defendant's waiver of his Miranda rights was involuntary," (ECF No. 71 at 2), it is not clear to the Court that the two standards are, in fact, that different, having already determined that § 3501 applies in this case. *See supra* Section III.A. Both Parties, moreover, seem to agree that whether the Mr. Kemmerer's statements are voluntary comes

1  duration of a three-hour interrogation alone was insufficient to establish coercion unless it

2  were "accompanied . . . by other facts indicating coercion, such as an incapacitated and

3  sedated suspect, sleep and food deprivation, and threats.")

4      In addition, the Court finds that Mr. Kemmerer's *Miranda* waiver was also

5  knowing and intelligent. *See United States v. Vallejo*, 237 F.3d 1008, 1014–15 (9th Cir.),

6  *opinion amended on denial of reh'g*, 246 F.3d 1150 (9th Cir. 2001). Here, Agent

7  Hutchinson read each *Miranda* right to Mr. Kemmerer, who confirmed his understanding

8  orally, initialed the waiver form at each question, and then signed the form. (Tr. 1 at 14–

9  23; *see* Gov't Hrg. Ex. 12, *Miranda* Form.) Mr. Kemmerer did not ask to clarify the

10  rights he relinquished by his waiver or otherwise indicate that he did not understand the

11  questions posed by Agent Hutchinson. (Tr. 1 at 33–36.) Mr. Kemmerer has, moreover,

12  not challenged to his understanding of the waiver – only that it was involuntary.

13      In light of these two findings – that Mr. Kemmerer's waiver was voluntary and that

14  the record shows no sign Mr. Kemmerer did not understand the waiver – the Court

15  concludes that Mr. Kemmerer's *Miranda* waiver was "voluntary, knowing and

16  intelligent." *Miranda*, 384 U.S. at 479.

17

18

19

20  ───────────────────

21  down to the coerciveness of any officers' conduct during Mr. Kemmerer's interrogation and preceding

22  detention. (*Compare* ECF No. 64 at 12 (Government arguing that involuntariness results from
    sufficiently "coercive circumstances") *with* ECF No. 68 at 2 (Mr. Kemmerer arguing that his arrest and

23  interrogation arose from "circumstances [that] were coercive"). Under these circumstances, the Court
    finds that Mr. Kemmerer's statements to Agent Hutchinson were made voluntarily because (1) Mr.

24  Kemmerer did not evince any special susceptibility to being coerced, (2) Agent Hutchinson's conduct
    and questioning did not evince physical or psychological coercion, (3) Mr. Kemmerer's demeanor

25  conveyed a willingness to engage with Agent Hutchinson, and (4) Mr. Kemmerer did not confess during
    the interview. That Mr. Kemmerer was held for six hours, with restraints during about two of those

26  hours, before being interviewed by Agent Hutchinson is not sufficient for a finding of involuntariness

27  given this case's specific circumstances, either under § 3501(c) or as to his *Miranda* waiver.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 2.  The Waiver Does Not Extend to Rule 5.

Having found that Mr. Kemmerer's *Miranda* waiver is valid, the Court now considers the Government's argument that Mr. Kemmerer "waived his presentment challenge when he waived his Miranda rights" in reliance on *United States v. Indian Boy X*, 565 F.2d 585, 591 (9th Cir. 1977). (ECF No. 24 at 8.) Mr. Kemmerer contends that *Indian Boy X* does not control because (1) it precedes the Supreme Court's most recent articulation of the prompt presentment rule in *Corley* by 32 years, (2) *Corley* makes no mentioned of a potential waiver via *Miranda*, and (3) the Ninth Circuit recently found a Rule 5 violation in *United States v. Liera*, 585 F.3d 1237, 1246 (9th Cir. 2009), despite acknowledging there was a valid *Miranda* waiver. (ECF No. 38 at 1–2.) In light of the Parties' arguments, the Ninth Circuits precedents, and the public policy reasons at issue in Rule 5, the Court finds that Mr. Kemmerer did not waive his right to prompt presentment because *Indian Boy X* does not remain good law, and there are strong reasons to conclude that waiver of Rule 5 and *Miranda* are distinct.

The Court begins its analysis with *Indian Boy X*. There, the Ninth Circuit concluded that "[n]either 'X' [n]or his parents lacked capacity to make a knowing waiver of Miranda rights . . . [and thus] the decision to make a statement to the F.B.I. was an intelligent, knowing one." *United States v. Indian Boy X*, 565 F.2d 585, 592 (9th Cir. 1977). As a result, since "the *Miranda* waiver was valid, there was a valid waiver of the *McNabb-Mallory* prompt arraignment right." *Id.* The Ninth Circuit first acknowledged this principle in *United States v. Lopez*, 450 F.2d 169, 170 (9th Cir. 1971), which in turn drew on the D.C. Circuit's decision in *Pettyjohn v. United States*, 419 F.2d 651, 656 (D.C. Cir. 1969) (finding that "appellant waived any Mallory claim to immediate arraignment by voluntarily agreeing to speak with the police.").

Since *Indian Boy X*, however, only one district court in this circuit has followed its holding. *See United States v. Lukens*, 735 F. Supp. 387, 391 (D. Wy. 1990). And no panel of the Ninth Circuit has followed suit. To the contrary, as Mr. Kemmerer observes, the

Ninth Circuit seems to have implicitly overruled *Indian Boy X* through its more recent ruling in *Liera*. *See United States v. Liera*, 585 F.3d 1237 (9th Cir. 2009). In *Liera*, the Ninth Circuit affirmed the district court's denial of Liera's motion to suppress his post-arrest statements on the basis of an invalid *Miranda* waiver because (1) Liera testified that he waived his *Miranda* rights and (2) Liera's counsel repeatedly stated that there had been a valid and knowing *Miranda* waiver. *Id.* at 1246. At the same time, however, the Ninth Circuit found that "the district court clearly erred by refusing to suppress statements Liera made during his second interrogation" because they occurred more than six hours after his arrest and that delay "unnecessary to complete the arraignment process or determine whether to file criminal charges against Liera." *Id.* at 1243. Consequently, and in contrast to both *Indian Boy X* and the Government's arguments, (ECF No. 71 at 11–13), the Ninth Circuit's decision in *Liera* plainly decouples a defendant's waiver of *Miranda* from that of Rule 5.

The Ninth Circuit's more recent treatment of *Miranda* and Rule 5 in *Liera*, moreover, better comports with the Supreme Court's analysis of Rule 5 in *Corley*. In *Corley*, the Supreme Court entertained a challenge to Rule 5 where the Government, in essence, argued that § 3501(a) "means that once a district court . . . finds a confession voluntary, in it comes [thereby] entirely eliminat[ing] *McNabb–Mallory* with its bar to admitting even a voluntary confession if given during an unreasonable delay in presentment." *Corley v. United States*, 556 U.S. 303, 313 (2009). In reliance on the language of the § 3501 as well as the statute's legislative history, the Supreme Court concluded that the Government's interpretation was untenable. *Id.* at 314–20. The Supreme Court also recognized the real-world concern that, without "*McNabb–Mallory* there is no apparent remedy for delay in presentment." *Id.* at 320. The Supreme Court reasoned that the protection afforded to criminal defendants by Rule 5 is thus more than "some administrative nicety" and, in fact, "stretches back to the common law, when it

was 'one of the most important' protections 'against unlawful arrest.'" *Id.* at 320 (quoting *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 61 (1991) (J., Scalia, dissenting)).

Here, the Government's interpretation poses the same risk as in *Corley* with respect to a smaller, but very substantial, number of criminal cases: those where the Government can show an adequate *Miranda* waiver has taken place more than six hours after an arrest. Indeed, because many courts have deemed *Miranda* waivers valid and confessions voluntary in such circumstances, the harms caused by unnecessary delays in presentment will have no remedy in a large swath of prosecutions if the Court adopts the Government's argument. *See, e.g.*, *United States v. Carpentino*, 948 F.3d 10, 29 (1st Cir. 2020) (upholding *Miranda* waiver despite "spells of alternating detention and questioning (lasting, in the aggregate, just over six hours)"); *United States v. Heron*, 564 F.3d 879, 881–82, 886–87 (7th Cir. 2009) (finding voluntary waiver where *Miranda* warnings were not administered until more than thirty-two hours after arrest); *Cunningham v. Perez*, 345 F.3d 802, 810–11 (9th Cir. 2003) (finding that an eight hour interrogation did not "undermine [defendant's] free will"); *United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002) (finding confession made after 31 hours was voluntary); *Bastidas v. Henderson*, 664 F. Supp. 51, 53–54 (E.D.N.Y.1987), *aff'd*, 842 F.2d 1287 (2d Cir.1988) (waiver found even though defendant had been held at the police station for ten hours before *Miranda* warnings were given). In other words, unless a defendant's Rule 5 waiver is decoupled from that of *Miranda* as in *Liera*, the very problem the Supreme Court sought to avoid in *Corley* will manifest in many other cases: "federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to." *Id.* (citing *McNabb v. United States*, 318 U.S. 332 (1943)).

In addition, the Court is not convinced that incorporating a Mr. Kemmerer's right to prompt presentment in a *Miranda* waiver is fair or prudent in these circumstances. As is evident from Mr. Kemmerer's *Miranda* form and questioning, Agent Hutchinson never

1   explained to Mr. Kemmerer that he has a right to appear before the Magistrate Judge

2   without unnecessary delay. Thus, in the absence of any explanation of this right, the

3   Court is not prepared to infer that Mr. Kemmerer would have "knowingly" or

4   "intelligently" waived his right to prompt presentment by electing to speak with Agent

5   Hutchinson. Certainly, in the context of *Miranda*, no such inference would be permissible

6   without the officer first instructing the defendant on his rights "before questioning

7   begins," *Davis v. United States*, 512 U.S. 452, 457 (1994), and the Court applies the same

8   reasoning here.

9         **C. Merits of Rule 5 Challenge**

10        Finally, the Court addresses the merits of Mr. Kemmerer's Rule 5 challenge. [8] The

11   Court "must find whether the defendant confessed within six hours of arrest." *Corley*,

12   556 U.S. at 320. For the following reasons, the Court concludes that Mr. Kemmerer's

13   statements were made within the "safe harbor" period under § 3501.

14        The Court calculates the safe harbor by first looking to the moment when Mr.

15   Kemmerer was arrested. The Court begins its analysis with *United States v. Juvenile*

16   *(RRA-A)*, 229 F.3d 737, 743 (9th Cir. 2000). In *Juvenile*, an inspector at the United States

17   border with Mexico ordered a juvenile defendant ("RRA–A") and the car transporting

18   him into the secondary inspection lot after noticing that the back seat cushions of the car

19   had no indentations. *Id.* at 741. The "vehicle occupants were brought into an office" and

---

[8] The Court rejects the Government's argument that Mr. Kemmerer must further specify which statements within the interview he seeks to suppress under 18 U.S.C. § 3501(c) because there is no dispute here that Mr. Kemmerer seeks to suppress his interview with Agent Hutchinson as a whole and the Parties have entered a tape of the interview into the record. Any requirement to further specify the statements to be suppressed, moreover, would seem to contradict common practice as the Ninth Circuit's opinions on Rule 5 motions to suppress incriminating statements do not always identify a specific statement to be suppressed or even explain how the subject statement is incriminating. *See, e.g.*, *United States v. Djordjevic*, 631 F. App'x 463, 464 (9th Cir. 2015) (noting only that defendant sought to suppress his "inculpatory statements"); *United States v. Van Poyck*, 77 F.3d 285, 287 (9th Cir. 1996) (referring only to defendant's "incriminating statements").

21

frisked. *Id.* In the meantime, "the inspector discovered 80.10 pounds of marijuana in the vehicle." *Id.* "RRA–A was subsequently handcuffed to a bench in a locked security office, where she remained for the next four hours." *Id.* In reliance on these facts, the Ninth Circuit determined that RRA–A was arrested once handcuffed because that "was the clearest indication that she was no longer free to leave." *Id.* at 743. Importantly, the Ninth Circuit also determined that the arrest did not happen before that moment because (1) defendant's temporary frisk in the security office merely "constituted a detention," and (2) "RA–A was handcuffed after the inspector discovered the narcotics in the vehicle, separating that detention from the search itself." *Id.*

Here, the completion of a search which led to the discovery of methamphetamine and probable cause to arrest, and the use of a restraint that objectively indicates a person is not free to leave (i.e., the ankle chain), converged at approximately 10:40 a.m. Upon attempting to enter the United States through the San Ysidro POE, Mr. Kemmerer was ordered to get out of his car and immediately handcuffed. (Kemmerer Decl. at ¶¶ 3–4; Perez ROI). An officer escorted Mr. Kemmerer to the security office with his hands cuffed behind his back. (Kemmerer Decl. at ¶¶ 6–7; Perez ROI.) That officer patted Mr. Kemmerer down, removed the handcuffs, and then "shackled [his] foot to the bench" of the security office. (Kemmerer Decl. at ¶ 8.) While shackled, Mr. Kemmerer "could not freely use the restroom," (Kemmerer Decl. at ¶ 10), and "[c]ertainly . . . was [not] free to get up at will and move around." (ECF No. 30 at 10.) The officers, moreover, "never told [Mr. Kemmerer] that [he] was not under arrest or that [the officer] was detaining [him] for officer safety." (Kemmerer Decl. at ¶ 5.) Thus, by the time Mr. Kemmerer was shackled at 9:41 a.m., he was subjected to the first factor: a level of restraint analogous to that of RRA–A's handcuffs in *Juvenile*.

In addition to the restraints at issue, the Court also looks to the point in time when probable cause ripened after drugs were discovered during a search of the load vehicle. As the Ninth Circuit remarked in *Juvenile*, determining the moment of arrest requires

1  "separating that detention from the search itself." *Juvenile (RRA-A)*, 229 F.3d at 743.

2  Here, that occurred at 10:40 a.m. While Mr. Kemmerer was being held in the security

3  office, the CBP officers at the POE conducted a thorough search of his car. First, CBP

4  Officer Abram Lopez examined images of Defendant's car on the Z-portal x-ray machine

5  and noticed several anomalies. (Hutchinson Decl. at ¶ 5.) Then, at approximately 10:15

6  a.m., CBP Officer David Davis inspected the vehicle, drove it to the processing area, and

7  removed one package from the rear passenger side quarter panel. (*Id.* at ¶¶ 6, 7.) Another

8  officer then tested its contents. (*Id.* at ¶ 7.) The contents tested positive for

9  methamphetamine no later than 10:40 a.m., at which point Davis contacted "Apple

10  Enterprises to potentially remove the fuel tank" from the car. (*Id.*) Thus, by 10:40 a.m.,

11  the officers' discovery of narcotics sufficiently separated Mr. Kemmerer's detention from

12  the search of his car. *Juvenile (RRA-A)*, 229 F.3d at 743. *Cf. United States v. Sanchez*,

13  No. 14-CR-2547-GPC, 2015 WL 1873208, at *6 (S.D. Cal. Apr. 23, 2015) ("the

14  circumstances of Sanchez's detention would lead a reasonable innocent person to believe

15  that he would be free to go once the search of the [car] was over and he answered any

16  questions" because "the search revealed packages containing methamphetamine.")

17      Thus, the Court finds that Mr. Kemmerer was arrested at 10:40 a.m. It was at this

18  time that there was both probable cause to arrest Mr. Kemmerer, following the discovery

19  of methamphetamine, and a level of restraint that would lead a reasonable person to

20  believe he was not free to leave. Thus, at this point, Mr. Kemmerer's arrest rose beyond

21  the level of a "temporary detention occasioned by border crossing formalities." *United*

22  *States v. Hernandez*, 322 F.3d 592, 596–97 (9th Cir. 2003) (quotation omitted).

23      Because the Court concludes that Mr. Kemmerer's arrest took place at 10:40 a.m.,

24  and recognizing that Agent Hutchinson began his interview of Mr. Kemmerer at 3:46

25  p.m. and concluded at 4:52 p.m., the Court finds that Mr. Kemmerer's interview fell

26  within the six-hour safe harbor period permitted under 18 U.S.C. § 3501(c). As such, it is

27  admissible. *Corley*, 556 U.S. at 320. That the interview went over by twelve minutes

28

under these specific circumstances is a de minimis violation not requiring suppression. *See United States v. Oropeza-Flores*, 230 F.3d 1368 (9th Cir. 2000) (finding no procedural harm resulting from a confession that began "six hours and a few minutes after [defendant's] arrest").

## IV.   Conclusion

For the foregoing reasons, the Court makes three findings here. First, the Court finds that § 3501(c) applies to Mr. Kemmerer's statements. Second, the Court finds that Mr. Kemmerer's valid *Miranda* waiver does not foreclose a challenge to the statements under § 3501(c). Lastly, the Court finds that Mr. Kemmerer's interview by Agent Hutchinson fell within six-hour safe harbor period of § 3501(c). Consequently, the Court **DENIES** Mr. Kemmerer's motion and declines to suppress his statements in the interview following his arrest.

**IT IS SO ORDERED.**

Dated:  August 14, 2020

Hon. Gonzalo P. Curiel
United States District Judge